934 P.2d 1

**In the Matter of the Application
of W. H. SHIPMAN, LTD.**

**No. 16494.**

Intermediate Court of Appeals of Hawai'i.

Feb. 28, 1997.

William J. Wynhoff (Gerson, Grekin & Wynhoff, of counsel), on the briefs, Honolulu, for respondents-appellants.

Sandra Pechter Schutte (Roehrig, Roehrig, Wilson, Hara, Schutte & De Silva, of counsel), on the brief, Hilo, for petitioners-appellees.

Before ACOBA and KIRIMITSU, JJ., and Circuit Judge WATANABE in Place of Burns, C.J., Recused.

ACOBA, Judge.

We hold in this appeal from the award of title by the land court (the court) to Petitioners–Appellees Roland Hideo Higashi, Clifton Kenichi Tsuji, Kenneth Kenichi Tanaka, and Howard Jitsuo Mimaki, purchasers at a United States Internal Revenue Service (IRS) real property tax sale under 26 U.S.C. § 6337(b) (1988) (hereinafter referred to collectively as Purchasers or the Purchasers) that the court erred in ruling that the attempt by the owner, Respondent–Appellant, Shizuko Yamamoto (Yamamoto), to redeem the subject property from the Purchasers was invalid. Consequently, we conclude that Yamamoto's redemption was valid and reverse the court's September 2, 1992 judgment which cancelled Certificate of Title No. 331690 issued to Respondent–Appellant Hanalea, Inc. (Hanalea), Yamamoto's successor-in-interest, and ordered the issuance of a new certificate of title for the subject property to the Purchasers.

I.

The following relevant facts were stipulated to by the parties at the May 8, 1992 hearing before the court.[1]

1. All documents referred to were received into evidence by stipulation.

2. 26 U.S.C. § 6321 states in relevant part:
 If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

3. The notices were issued against Hirotoshi Yamamoto and his wife, Shizuko Yamamoto (Yamamoto). The property involved here was conveyed to Yamamoto by her husband.

On July 25 and August 31, 1988, the IRS recorded tax liens, pursuant to 26 U.S.C. § 6321,[2] against Yamamoto[3] in the Hawai‘i Bureau of Conveyances.[4] Because the taxes remained unpaid, on February 21, 1988, Yamamoto's property was seized by the IRS through a written notice of seizure.[5] The property consists of "39.258 acres of unimproved real property located at TMK 3114, parcel 5, lot number 54" located at Kea‘au, Puna, on the island of Hawai‘i. The assessed value of the property in 1988 was $23,988.

The IRS's notice of sealed bid sale for the property, seizure no. 99–11–89–18, advertised a minimum bid price of $12,000 for the property. The notice stated that the property was seized from Yamamoto for nonpayment of taxes. The notice also quoted that portion of the Internal Revenue Code, 26 U.S.C. § 6337, which provides for redemption rights in the owner of the property being sold at a tax sale.

On March 15, 1989, the sealed bid sale was held. Clarence Ching, the president of Hanalea, submitted a bid of $15,000. Roland Hideo Higashi (Higashi), on behalf of Purchasers,[6] submitted the highest bid, $18,000. The Purchasers paid this amount, pursuant to 26 U.S.C. § 6338(a), and received a certificate of sale (certificate) in return. The certificate included a notice to the Purchasers of the owner's redemption rights. The notice, which set forth 26 U.S.C. § 6337(b), stated:

*Redemption Rights*

The rights of redemption of real estate after sale, as specified in Code 6337(b), are quoted below:

4. 26 U.S.C. §§ 6323(a) and (f) and Hawai‘i Revised Statutes (HRS) § 505–1 (1985) authorize the United States Internal Revenue Service (IRS) to file notice of a tax lien in the Hawai‘i Bureau of Conveyances.

5. 26 U.S.C. §§ 6331(a) and (b) authorize the IRS to seize property.

6. Part of the stipulation was that Roland Hideo Higashi (Higashi), at all relevant periods, acted on behalf of Petitioners–Appellees Higashi, Clifton Kenichi Tsuji, Kenneth Kenichi Tanaka, and Howard Jitsuo Mimaki (Purchasers or the Purchasers).

(b) Redemption of Real Estate After Sale.

(1) Period.—*The owners of any real property sold as provided in section 6335,* their heirs, executors, or administrators, or any person having any interest therein, or a lien thereon, *or any person in their behalf, shall be permitted to redeem the property sold,* or any particular tract of such property, at any time *within 180 days after the sale thereof.*

(2) Price.—*Such property or tract shall be permitted to be redeemed upon payment to the purchaser,* or in case he [or she] cannot be found in the county in which the property to be redeemed is situated, then to the Secretary, for the use of the purchaser, his [or her] heirs, or assigns, *the amount paid by such purchaser and interest thereon at the rate of 20 percent per annum.*

(Emphases added.)

On June 29, 1989, Yamamoto received instructions from Rebecca Nadler (Nadler) of the IRS regarding the procedures for redemption of the property. Nadler instructed Yamamoto that she "should inform the IRS if the property is redeemed," including "the date the property was redeemed, the amount paid in order to redeem the property and to whom the funds were paid."

Subsequent to the purchase of the property, Higashi received a letter dated June 30, 1989 from Alfred Y.K. Au (Au). The letter included a receipt form and a cashier's check for $19,070 and stated that the cashier's check was for redemption of Yamamoto's property. This check represented the bid price plus the twenty percent interest earned on the bid price from the time of the purchase to the redemption. The parties do not dispute that the redemption, if valid, was timely made and the tendered amount correct.

The letterhead of the June 30, 1989 letter identified Au as a certified public accountant and included Au's address and telephone number. The letter stated:

Gentlemen:

Enclosed, please find the following:

1. First Hawaiian Cashier Check for $19,070.00 *in full Redemption* of Seizure Number 99–11–89–18, Sealed Bid Sale of SHIZUKO YAMAMOTO'S Puna Property TMK (3) 1–1–4–5, on March 15, 1989.

2. Receipt for the above payment to be executed and returned by you to Shixuko [sic] Yamamoto and/or Hanalea, Inc.

3. A self-addressed envelope for your convenience in returning Receipt, Certificate of Sale, and other papers and documents.

Your prompt attention to this matter will be appreciated.

(Emphasis added.) The letter was signed by Au. The receipt form included with the letter stated:

### RECEIPT

Received from SHIZUKO YAMAMOTO and/or HANALEA, Inc. the sum of Nineteen Thousand, Seventy Dollars and no/100—(19,070.00) *for the redemption of her property.* TMK (3) 1–1–4–5.

(Emphasis added.)

On July 5, 1989, Yamamoto filed a deed with the court conveying the property to Hanalea. The deed reserved to Yamamoto "the exclusive non-transferable right to FIFTY PERCENT (50%) of the net profit to be derived from the operation, lease or other disposition and/or sale of said property." Hanalea was issued land court Certificate of Title No. 331690 to the property.

In response to Nadler's June 29, 1989 letter, Yamamoto wrote a letter dated July 25, 1989 to inform the IRS that (1) the property was redeemed on June 30, 1989; (2) Higashi was paid by cashier's check in the amount of $19,070; and (3) the payment was mailed by "Restricted Delivery." Attached to this letter was a copy of the "return receipt." At the bottom of the letter, Yamamoto stated, "If you have any questions please contact my CPA, Au.... He hanled [sic] the transaction for me."

On the day after the redemption period expired and over two months after Au wrote Purchasers, Purchasers sent a letter dated September 12, 1989 through their attorney to Au. The letter stated that "[Purchasers] are

rejecting your purported redemption of the subject property" and returned the cashier's check for $19,070. Purchasers explained that they were rejecting the redemption because they were not provided with "any verification" that Au had an interest in the land or was acting on behalf of Yamamoto. In response, Au wrote a letter dated September 15, 1989 to Purchasers' attorney informing him that Nadler "proctored" the redemption. Au also referred to Yamamoto's July 25, 1989 letter to Nadler where Yamamoto indicated that Au was her CPA.[7] Au pointed out further "that [he] ha[d] expended much time locating [Purchasers] to explain the redemption provisions which is always part of foreclosure sales of real property."

On October 18, 1989, the district director for the IRS issued a deed for the property to Purchasers. The deed stated that "more than 180 days have elapsed from the date of sale and the date of issuance of [the] Certificate of Sale" to Purchasers.[8]

On December 19, 1989, Higashi filed a petition pursuant to HRS §§ 501–144 and 501–191 [9] seeking to have the court registrar cancel Hanalea's Certificate of Title No. 331690 and issue a new certificate of title pursuant to the IRS deed dated October 18, 1989. HRS § 501–144 (1993) states in relevant part:

> **New certificate after enforcement of lien; tax sale.** After registered land has been sold on any execution, or taken or sold for the enforcement of any lien of any description, the person claiming under an execution or under any deed or other instrument made in the course of proceedings to levy the execution or enforce any lien, may petition the court for the entry of a new certificate to the person, and the application may be granted. . . .

The hearing on Purchasers' petition occurred on May 8, 1992. The court heard testimony from Clifford Kaminaka (Kaminaka), Nadler, Higashi, Au and Yamamoto.

Kaminaka worked for the IRS in Hilo as a collection officer. His duties included the seizure and sale of property. Kaminaka testified that a title search of the subject property did not reveal that either Au or Hanalea had an interest. Kaminaka also described the process for arriving at the minimum bid price and the information provided to potential bidders regarding the property. Information provided potential bidders included a list of encumbrances, the notice of sale, and an explanation of the bid procedure and of the taxpayer's redemption rights. Kaminaka related that five bids were received and that the Hanalea bid was $15,322. Kaminaka stated that it is his standard procedure to make an announcement of the amounts of the bids only and not to name the parties making bids. However, he did not specifically remember what he did at the auction involved. Kaminaka acknowledged that he issued Higashi a certificate of sale which stated Higashi was the successful bidder and that the property had been purchased for $18,000.

Nadler testified that she handled the file for the property involved in this case. Purchasers' counsel questioned Nadler about the procedure for dealing with seized property sold in a tax sale as follows:

---

**7.** Alfred Y.K. Au's (Au) letter to the Purchasers' attorney made references to Yamamoto's letter to Rebecca Nadler (Nadler) as exhibit B, Nadler's June 29, 1989 letter to Yamamoto as exhibit A, and the deed transferring title to Hanalea, Inc. (Hanalea) as exhibit C.

**8.** The deed was issued pursuant to 26 U.S.C. § 6338(b) (1988):

 (b) Deed to real property

 In the case of any real property sold as provided in section 6336 and not redeemed in the manner and within the time provided in section 6337, the Secretary shall execute (in accordance with the laws of the State in which such real property is situated pertaining to sales of real property under execution) to the purchaser of such property at such sale, upon

his surrender of the certificate of sale, a deed of the real property so purchased by him, reciting the facts set forth in the certificate.

 On December 20, 1989, Yamamoto filed a complaint in the United States Claims Court against the commissioner of the IRS challenging the tax deficiencies assessed by the tax court and seizures made pursuant to the tax court judgment. On June 1, 1990, Yamamoto amended the complaint to challenge the propriety of the IRS deed. On April 29, 1991, the claims court filed an order dismissing Yamamoto's complaint for lack of jurisdiction. The order did not discuss Yamamoto's claim against the IRS deed.

**9.** This section was repealed in 1988.

Q. Okay. What about after the sale, what do you do?

A. We will normally look at the certificate of sale that was issued to the purchaser, we will place it in the file, and we will wait the six months time frame to see if the taxpayer redeems the property. That's to monitor the issuance of the deed.

Q. And then once the six months—if—if the six months expires, then what do you do?

A. I will normally send a short letter to the purchasers asking them to return to the [IRS] the certificate of sale and also ask them to inform us as to how it is that the buyers wish to hold the property.

Q. And what if a taxpayer wants to redeem the property, then what do you do?

A. *Normally we don't really take any action per se. The redemption of the property is between the taxpayer and the buyer.* The taxpayer can—usually will inform us that they have redeemed the property, and that's normally done. The taxpayer, will if possible, get back from the buyer the certificate of sale to show that they have redeemed the property.

(Emphasis added.) Nadler admitted that she received Yamamoto's July 25, 1989 letter informing her that the property was redeemed on June 30, 1989. Nadler "believed that the property had been redeemed so [she] placed a copy of the letter in the file and closed out [the IRS's] seizure file on it."

On September 18, 1989, Nadler received Purchasers' request that a deed to the property be issued on their behalf. Not knowing how to respond to the request, Nadler forwarded the file on the property to the IRS district counsel who subsequently issued a deed to Purchasers.

On October 20, 1989, the file on the property was returned to Nadler. In the file was a "Record of Seizure and Sale of Real Estate" form. Nadler crossed out the entries which she had made on the form indicating that Yamamoto had redeemed the property on June 30, 1989 by paying Purchasers $19,-070. On the side of the form she wrote, "see seizure file." Nadler explained that she placed that notation there because

after a decision had been made to issue the deed to [Purchasers], then the question as to whether—you can't both issue a deed and have the property redeemed, it was one or the other. So since we issued the deed, we lined out that the property had been redeemed.

During cross-examination, Nadler related that she spoke with Au on the phone and that she "believed [that] he was calling on [Yamamoto's] behalf," but she did not know "[w]hether or not [Au] formally represented [Yamamoto.]" In response to the court's inquiry, Nadler indicated that the IRS does not issue any document confirming a redemption and that title passes to the tax sale purchaser after the redemption period expires. According to Nadler, a deed issued by the IRS to the purchaser extinguishes the taxpayer's title to the property.

Higashi testified that the names of the unsuccessful bidders were read aloud after the sale and that he remembered Hanalea to be one of the bidders. He understood that "the taxpayer could redeem the property, or anyone else who had a lien on the property or a representative of the taxpayer." Referring to the June 30, 1989 letter from Au, he stated, "It did say it was to be submitted to Mrs. Yamamoto and/or Hanalea, Inc., but nowhere in that letter was [Au] very specific in saying I am the representative of [Yamamoto]." Further, he indicated that his "assumption was [that Au] was representing Hanalea, Inc." Not knowing who Au was, Higashi contacted the Department of Commerce and Consumer Affairs and obtained a list of officers for Hanalea. The list included Clarence Ching, Robert Hee, Laura Au, and Donald Hee. Higashi assumed that Au was related to Laura Au. Higashi also concluded that the redemption was invalid because Hanalea, an unsuccessful bidder, was attempting to obtain the property. Higashi admitted to talking to Au on the phone sometime in August. He did not remember the substance of the conversation, but he did remember Au told him the property was transferred to Hanalea. He did not ask Au whether he represented Yamamoto.

Au stated that he had been Yamamoto's accountant for almost thirty years and that

his family owned shares in Hanalea. Au presented Yamamoto with a list of options that might aid her in resolving her tax problems. One of the options was for the Yamamoto family to purchase the property at the tax sale. Another option was for Hanalea to bid at the tax sale. Au acknowledged that he was instrumental in convincing Hanalea to place a bid for Yamamoto's property.

Au explained that the address on the letterhead of the June 30, 1989 letter was also the address for Hanalea. In addition, the letter did not identify Hanalea, nor did it expressly state that either he or Hanalea represented Yamamoto. However, Au believed his representation of Yamamoto was "presumed by [the] statement [that] Shizuko Yamamoto [was] supposed to get the receipt." Au also declared that the money for the redemption was provided by Hanalea.

On cross-examination, Au indicated that sometime in August 1989, he told Higashi over the phone that "there was a redemption and that Mrs. Yamamoto has executed a deed to Hanalea, Inc., reserving 50 percent of the profit for herself ... [and] the check was sent on her behalf for the redemption." According to Au, Higashi told him that "one of these days I get the boys together and sign the check." Au stated emphatically that he represented Yamamoto from June 30, 1989 until September 12, 1989 and that he was convinced that the redemption of the property was valid.

Yamamoto testified that she asked "Au to handle [the] redemption of the property" for her, and she did not object to Au's representation despite his relationship with Hanalea. On cross-examination, she stated Hanalea paid for the redemption in exchange for her conveying the property to them.

After the witnesses testified, the court made oral findings. The court found that

"neither Hanalea [n]or Mr. Au acted as an agent for Mrs. Yamamoto. But even if they did, there was no written contract ... for the agency, which [the court] believe[s] would have been required." Thus, the court concluded "that it was reasonable for [Purchasers] to reject the attempted redemption" and found "that the attempted redemption was invalid." The written findings of fact, conclusions of law and order and the judgment cancelling Hanalea's Certificate of Title No. 331690 and ordering the issuance of a new certificate of title to the Purchasers were subsequently filed on September 2, 1992.

On appeal, Yamamoto and Hanalea argue that the court erred in (1) "finding and concluding that Hanalea was not acting in behalf of Mrs. Yamamoto in attempting to redeem the property"; (2) finding that Purchasers did not waive their right to reject the redemption or were not estopped from rejecting the redemption; and (3) refusing admission of evidence showing that the IRS refused to take a position in the dispute.[10]

In their reply brief, Yamamoto and Hanalea withdrew their third contention as an issue on appeal. We agree with their first contention, and therefore find it unnecessary to address their second point.

## II.

We "review the land court's written decision and the entire record" to determine the correctness of the land court's decision. *State v. Magoon,* 75 Haw. 164, 180, 858 P.2d 712, 720, *reconsideration denied,* 75 Haw. 580, 861 P.2d 735 (1993). The land court's findings of fact will not be disturbed "[u]nless we are firmly convinced that a mistake has been made[.]" *In re Wong,* 47 Haw. 472, 478, 391 P.2d 403, 406 (1964) (per curiam)

---

10. The subject of this particular contention was a March 1, 1990 letter from the IRS regional counsel apparently sent in response to a letter from Au to the IRS commissioner. In the letter, the regional counsel made clear that the IRS took no position on the merits of the instant case:

> Absent some indication of bad faith or fraud on the part of the purchasers, it is our policy in this situation to issue the deed to the purchasers, thereby allowing the parties to litigate the

disputed redemption without delay and without further involvement on the part of the Internal Revenue Service. This was done here, and we understand that the purchasers have instituted legal proceedings in Land Court to clear title to the property and resolve the disputed redemption. *This judicial proceeding should provide you with a full and fair opportunity to resolve your dispute.*

(Emphasis added.)

(adopting the "clearly erroneous" standard).[11] The land court's conclusions of law are "'not binding upon an appellate court and [are] freely reviewable for [their] correctness.'" *AIG Hawaii Ins. Co., Inc. v. Estate of Caraang*, 74 Haw. 620, 628, 851 P.2d 321, 326 (1993) (quoting *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992)).

### III.

We first examine the operative statute.

### A.

26 U.S.C. § 6337 (1988) governs the redemption of property sold at tax sales by the IRS. Sections 6337(b)(1) and (2) provide in pertinent part:

**(b) Redemption of real estate after sale.**

**(1) Period.** The owners of any real property ... their heirs, executors, or administrators, or any person having any interest therein, or a lien thereon, or any person in their behalf, shall be permitted to redeem the property sold ... at any time within 180 days after the sale thereof.

**(2) Price.** Such property ... shall be permitted to be redeemed upon payment to the purchaser ... the amount paid by such purchaser and interest thereon at the rate of 20 percent per annum.

Under the sale procedure, a purchaser does not initially receive the deed to the real property. Instead, the purchaser is issued a "certificate of sale" which the purchaser must surrender if the property is redeemed within 180 days. *See* 26 U.S.C. § 6338. The purchaser will only be issued a deed to the real property pursuant to 26 U.S.C. § 6338(b) after the redemption period has expired. The deed "shall be considered and operate as a conveyance of all the right, title, and interest the party delinquent had in and to the real property ... at the time the lien of the United States attached thereto." 26 U.S.C. § 6339(b)(2). The delivery of the deed to a purchaser discharges any "liens, encumbrances, and titles" which attached to the real property after the federal tax lien. 26 U.S.C. § 6339(c).[12] In contrast, after redemption, the owner obtains the real property subject to any remaining liens or tax debts not paid in the tax sale.

### B.

A version of section 6337(b) has been a part of the laws of the United States since 1866.[13] The language of section 6337(b) remains substantially unchanged from its original version. Prior enactments of the section gave owners a longer one-year grace period within which to redeem their property.[14]

---

**11.** The applicability of a more restricted standard of review for findings of fact issued under a writ of error, left undecided in *In re Wong*, 47 Haw. 472, 478 n. 1, 391 P.2d 403, 406 n. 1 (1964) (per curiam), and in *In re Real Property Situate at Moiliili, Waikiki–Waena, City and County of Honolulu*, 49 Haw. 537, 546, 425 P.2d 83, 89 (1967), has been settled by the abolition of writs of error. Hawai'i Rules of Civil Procedure Rule 73(i) (deleted 1984).

**12.** The statute provides in relevant part, "A ... deed to real property executed pursuant to section 6338 shall discharge such property from all liens, encumbrances, and titles over which the lien of the United States with respect to which the levy was made had priority." 26 U.S.C. § 6339(c).

A party acquiring a judgment lien on real property after the government files a federal tax lien on it is constitutionally entitled to "personal service or mailed notice" before its lien can be extinguished under section 6339(c). *Verba v. Ohio Casualty Ins. Co.*, 851 F.2d 811, 816 (6th Cir.1988).

**13.** The statute read as follows:

The owners of any real estate sold as aforesaid, their heirs, executors, or administrators, or any person having any interest therein, or a lien thereon, or any person in their behalf, shall be permitted to redeem the land sold as aforesaid, or any particular tract thereof, at any time within one year after the sale thereof, upon payment to the purchaser, or, in case he cannot be found in the county in which the land to be redeemed is situate, then to the collector of the district in which the land is situate, for the use of the purchaser, his heirs or assigns, the amount paid by the said purchaser and interest thereon at the rate of twenty per centum per annum.

14 Stat. 93, 109 (1866).

**14.** In 1966, the existing one-year redemption period was reduced to 120 days. Pub.L. No. 89–719, title I, § 104(e), 80 Stat. 1137 (1966). The period was reduced because "a long redemption period tends to unnecessarily depress the price which potential purchasers are willing to bid for

The IRS adopted a regulation on the redemption of real property in 1954. However, the regulation is essentially section 6337 verbatim. *See* Treas. Reg. § 301.6337–1 (as amended 1972).[15]

Although a form of section 6337(b) has been in existence for quite some time, only a limited number of cases have construed this particular section. However, "the general rule of courts [is] to give to statutes authorizing redemption from tax sales a construction favorable to owners[.]" *Corbett v. Nutt*, 77 U.S. 464, 474, 10 Wall. 464, 19 L.Ed. 976 (1870) (interpreting Act of June 7, 1862, § 7, 12 Stat. 423 [16]). Furthermore, courts have applied this general rule of liberal construction benefitting owners when interpreting section 6337(b).

In *United States v. Lowe*, 268 F.Supp. 190, 191–92 (N.D.Ga.1966), *aff'd, Lowe v. Monk*, 379 F.2d 555 (5th Cir.1967), *cert. denied*, 389 U.S. 1039, 88 S.Ct. 775, 19 L.Ed.2d 827 (1968), the issue was whether a party who was owner of a one-half undivided interest in certain real property sold at a federal tax sale and who held quitclaim deeds of the subject property was entitled to redeem the property under the provision in section 6337(b) which allows "any person having any interest" in the property to redeem. The court pointed out that "[f]rom the earliest times this right [to redeem] has been clearly recognized and jealously guarded by United States Courts." *Id.* at 192. Although the court acknowledged that *Corbett* involved a different redemption statute, it found the general rule in *Corbett* applicable to section

6337(b) inasmuch as *Corbett* "clearly show[ed] that leniency should be afforded in the redemption of property." *Id.* Consequently, the court held that the person had the right to redeem the property under the statute. *Id.*

Furthermore, the rule of liberal construction has been applied to extend redemption rights to the beneficial owner of an interest in land. In *DiFoggio v. United States*, 484 F.Supp. 233, 234 (N.D.Ill.1979), the plaintiff's beneficial interest to a land trust was sold at a tax sale. The purchaser rejected an attempted redemption by the plaintiff arguing that a beneficial interest is a personal property interest and was not covered by the statute. The court disagreed, stating . that "[c]ourts traditionally looked with favor upon redemption and have given liberal construction to redemption statutes." *Id.* at 236 (citations omitted). Therefore, it held, "as a matter of law[,] that the owner of the beneficial interest in [a] ... land trust is entitled to redeem that property under § 6337[ (b) ] of the Code." *Id.* at 236–37. The court reasoned that the owner "should not be precluded from redeeming her property after the extraordinary remedy of seizure and sale of her home simply because her ownership rights have been labeled personal property." *Id.* at 236.

In *Anselmo v. James*, 449 F.Supp. 922, 925 (D.Mass.1978), the court stated that "[t]he owner's right to redeem property seized by the United States for non-payment of taxes has long been recognized ... [and]

---

property at [the tax] sales." S.Rep. No. 1708, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Admin. News 3722, 3741. *See* Annotation, *Construction and Application of § 6337(b) of Internal Revenue Code of 1954 (26 USCS § 6337(b))*, Providing for Redemption of Real Estate After Tax Sale, 12 A.L.R. Fed. 979, 983 (1972).

In 1982, the redemption period was expanded from 120 days to its present 180 days. Tax Equity and Fiscal Responsibility Act, Pub.L. No. 97–248, title III, § 349A(a), 96 Stat. 639 (1982).

In 1977, the words "or his delegate" which appeared after "Secretary" were stricken. Pub.L. No. 94–455, title XIX, § 1906(b)(13)(A), 90 Stat. 1834 (1977).

**15.** The present treasury regulation on redemption of property does not reflect the 1982 amend-

ment to the statute changing the period of redemption from 120 to 180 days. *See* 95(13) CCH–Standard Federal Tax Reports, ¶ 39,141 at 65,671.

**16.** The statute provided:

[T]he owner of the land, or any loyal person of the United States having any valid lien upon or interest in the land, may at any time, within sixty days after the sale, appear before the board of tax commissioners, in proper person, and redeem the land from sale upon paying the amount of the tax and penalty, with the interest and expenses prescribed, and taking an oath, if a citizen, to support the Constitution of the United States.

*Corbett v. Nutt*, 77 U.S. 464, 473, 10 Wall. 464, 19 L.Ed. 976 (1870).

the general rule is one of leniency to the owner[.]" (Citations omitted.)

As we discern it, the underlying rationale for liberal construction of section 6337(b) is to provide delinquent taxpayers relief from "[g]overnmental seizure and sale of land [which] is one of the most potent weapons in the government's tax collection arsenal." *Reece v. Scoggins*, 506 F.2d 967, 971 (5th Cir.1975). For "[t]he consequences of seizure and sale are often staggering and irreversible; this action not only deprives a taxpayer of a sometimes significant capital investment but also denies him [or her] a source of additional income." *Id.* Thus, "[t]he purpose behind section 6337 is to allow taxpayers whose property has been seized by the IRS to repurchase their property, if they can do so within 180 days." *Taylor v. United States*, 72 A.F.T.R.2d 93–6577, 93–6579, 1993 WL 597379 (D.Ariz.1993). Accordingly, when applying 26 U.S.C. § 6337, we liberally construe its provisions in favor of the owner/redeemer.[17]

## IV.

Next, we review the pertinent court findings of fact and conclusions of law.

## A.

■ Finding of fact No. 17 states, "In the attempted redemption neither Hanalea nor Mr. Au acted as agent for Mrs. Yamamoto." In light of the redemption provision, 26 U.S.C. 6337(b), we believe that the court's finding was clearly erroneous. *See Cho Mark Oriental Food v. K & K Int'l*, 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992) (Trial court errs when, despite evidence to support findings, appellate court is left with definite and firm conviction upon review of whole record that a mistake has been made).

Initially, we note that the court's finding No. 15 is somewhat inconsistent with finding No. 17. Finding No. 15 states: "Mr. Au had been Yamamoto's CPA for over thirty

years[,] and his motives were proper in trying to help Yamamoto with the IRS sale; however, at the time of the attempted redemption, Mr. Au was also acting as an agent for Hanalea." We might on this finding alone resolve the issue of "agency." Nothing in section 6337 prohibits Au from also acting on behalf of Hanalea (assuming that he did) as well as Yamamoto. But, in our view, there was additional evidence in the record to establish that Au redeemed the property on behalf of Yamamoto.

Au's June 30, 1989 letter satisfied all the requirements of a notice of redemption. *See* 26 U.S.C. § 6337(b). It was addressed to the Purchasers. It referenced the proper IRS sequence number. It correctly identified the property tax number and the date of sale. It identified the property sold as having belonged to Yamamoto. It transmitted a check made out to the Purchasers in the correct amount for redemption, well within the 180–day period. It expressly indicated that the check was "in full redemption" of the sale of Yamamoto's property. It requested return of the "certificate of sale" as provided for under the statute.

The evidence presented to the court also demonstrated that Au acted "in behalf" of Yamamoto. In Yamamoto's July 25, 1989 letter to Nadler at the IRS notifying Nadler that she had redeemed the property, Yamamoto stated that "Au hanled [sic] the transaction" for her. This letter was stipulated into evidence by the parties but was not referred to by the court in its findings of fact or conclusions of law. Yamamoto's testimony that she asked Au to handle the redemption of her property was unrebutted.

The June 30, 1989 letter to Purchasers transmitting the notice of redemption, receipt, and check was written and signed by Au. Au's name, address and phone number appeared on the letterhead. Au wrote that the enclosed cashier's check was "in full [r]edemption of [the][s]eizure" and the "[s]ealed [b]id [s]ale of SHIZUKO YAMAMOTO'S

17. In construing Hawai'i's redemption statute, HRS § 246–60 (1968), the Hawai'i Supreme Court has acknowledged that "[t]he statute should be liberally construed in the taxpayer's favor because it is the policy of this State to give the taxpayer every reasonable opportunity to redeem his [or her] property[.]" *Hawaiian Ocean View Estates v. Yates*, 58 Haw. 53, 58–59, 564 P.2d 436, 440 (1977) (citations omitted).

Puna Property ... on March 15, 1989." A self-addressed envelope was enclosed for returning the receipt and Purchasers' certificate of sale. The attached receipt form indicated that the sum was "Received from SHIZUKO YAMAMOTO and/or HANA-LEA, Inc." and was *for the Redemption of her property* [.]" (Emphasis added.) The fact that the return was to be made to "Shixuko [sic] Yamamoto and/or Hanalea, Inc." indicates that in sending the letter, Au was acting on behalf of Yamamoto. Moreover, Au testified that although there was no statement to the effect that he represented Yamamoto, "it is presumed by [his] statement [that] Shizuko Yamamoto is supposed to get the receipt."

In addition, Au testified that he contacted Higashi in August 1989 and informed him that

> [T]here was a redemption and that Mrs. Yamamoto has executed a deed to Hanalea, Inc., reserving 50 percent of the profit for herself—for her family. And, therefore, the—there were—the check was sent on her behalf for the redemption.
>
> And the reply I got from Mr. Higashi is that one of these days I get the boys together and sign the check.

Based upon the foregoing, we are firmly convinced that the court made a mistake in finding that Au did not act as an "agent" for Yamamoto. We believe it is clear that Yamamoto sought to have her property redeemed, and furthermore that Au acted in her behalf in doing so.

### B.

In findings of fact Nos. 19 and 20, the court concluded that a written contract providing for an agency relationship between Au and Yamamoto was necessary for a valid redemption. Findings of fact Nos. 19 and 20 state as follows:

> 19. The Statute of Frauds, Chapter 656, Hawaii [Hawai'i] Revised Statutes, requires a writing for a contract to transfer an interest in real property and the Equal Dignities Rule provides that if the underlying real estate contract requires a writing, then the agency to transfer that contract

and to act on behalf of others in the transfer of the interest in real property requires equal dignity and must be in writing.

> 20. If there had been an agency relationship between Hanalea and Yamamoto, the relationship it [sic] could not [be] recognized by the Court since such agency was required to be in writing under the Statute of Frauds, and under the Equal Dignities Rule.

For purposes of appellate review, the nature of the determination, not the label given by the trial court, is critical. *Molokoa Village Dev. Co., Ltd. v. Kauai Elec. Co., Ltd.*, 60 Haw. 582, 596, 593 P.2d 375, 384 (1979). Accordingly, although the above statements were labeled as findings of fact, they are really conclusions of law with respect to the purported relationship between our statute of frauds and 26 U.S.C. § 6337(b). Therefore, we review these conclusions *de novo*. *Id.*

### 1.

■ Our statute of frauds provides that

[n]o action shall be brought and maintained ... [u]pon any contract for the sale of lands ... or of any interest in or concerning them ... unless the promise, contract, or agreement, upon which the action is brought, or some memorandum or note thereof, is in writing, and is signed by the party to be charged therewith, or by some person thereunto by the party in writing lawfully authorized....

HRS § 656–1 (1985). The statute "requires that documents transferring any interest in land be in writing and signed by the person to be charged therewith and that if they are signed by another on his behalf, the authorization of such other [should] also be in writing." *Honolulu Memorial Park, Inc. v. City and County of Honolulu*, 50 Haw. 189, 191, 436 P.2d 207, 209 (1967) (interpreting Rev. Laws Haw. § 190–1 (1955)). Thus, for transactions falling within the statute of frauds, the authorization for another to act on behalf of the person transferring an interest in land must be in writing.

■ However, the statute of frauds only applies to instruments involving the *transfer* of an interest in real property. Redemption under 26 U.S.C. § 6337(b) does not involve a

transfer of interest in real property. Redemption is defined as "[t]he process of cancelling and annulling a defeasible title to land, such as is created by a ... tax-sale, by paying the debt or [by] fulfilling the other conditions." *Black's Law Dictionary* 1278 (6th ed. 1990). "It restores the owner to his [or her] title as it stood before the sale[.]" *Samet v. United States*, 242 F.Supp. 214, 222 (M.D.N.C.1965) (citation and internal quotation marks omitted). The effect of "redemption ... [is] to (1) defeat the estate of the purchaser at the tax sale, and (2) to leave the title to the land where it would have been had no sale taken place." *Id.* at 223. Because no real property interest was transferred to Yamamoto by virtue of her redemption, the statute of frauds is inapplicable.

### 2.

■ Section 6337(b) moreover does not require that an agency agreement between the owner and the person acting in the owner's behalf in redeeming the property be in writing. The statute only provides that "owners ... or *any person in their behalf*, shall be permitted to redeem the property...." 26 U.S.C. § 6337(b)(1) (emphasis added). Furthermore, we are not aware of any case involving section 6337(b) which holds that one acting in the owner's behalf to redeem property must have a written agency contract to do so.

In any event, imposing a written agency requirement on the right of the owner to engage any person to act in the owner's behalf for redemption purposes would place an unjustified qualification upon the broad language of the statute. "[T]he extent or measure of the [redemption] right is found in the statutory terms prescribing the time and method of its exercise and designating the persons who may exercise it." *Lynch v. Burt*, 132 F. 417, 429 (8th Cir.1904). A written agency requirement would only serve to restrict the exercise of the owner's redemption right in a manner not expressly or implicitly intended under the language of the statute. "It would, therefore, seem not to be necessary for the purposes of justice, or to effectuate the objects of the law, that the right to redeem should be narrowed down by [such] a strict construction." *Dubois v. Hepburn*, 35 U.S. 1, 22, 10 Pet. 1, 9 L.Ed. 325 (1836).

### C.

Having concluded that Au did act on behalf of Yamamoto to redeem her property and his agency was valid, we are faced with the issue of whether Au's actions constituted a valid redemption.[18]

### 1.

Section 6337(b) provides that "[s]uch property or tract of property shall be permitted to be redeemed upon payment to the purchaser, or in case he [or she] cannot be found in the county in which the property to be redeemed is situated, then to the Secretary[19] ...." 26 U.S.C. § 6337(b)(2). Thus, "[t]o redeem the property, the interested party need only pay the purchaser of the property the amount which was paid by the latter at the tax sale, plus interest at the rate of 20 percent per annum." *Taylor*, 72 A.F.T.R.2d at 93–6579.

Courts interpreting section 6337(b) have held that under the statute, a tender of the proper amount of money is sufficient to constitute redemption. For example, in *Rosen v. Norton*, 970 F.2d 1079 (2d Cir.1992), *cert. denied*, *Norton v. Rosen*, 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 670 (1993), an attorney for the owners went to the home of the purchaser and tendered a certified check to the purchaser, within the statutory period, for the purpose of redeeming the owners' property. The purchaser told the attorney, " 'I refuse the tender. Goodbye', and shut the door." *Id.* at 1079. The owners' motion to compel the purchaser to accept the tender was denied based on the district court's finding that the amount tendered was deficient.

---

18. Neither 26 U.S.C. § 6337(b) nor the regulation promulgated thereunder set forth detailed steps regarding the course a taxpayer-owner must follow to properly exercise his or her right of redemption.

19. Under Title 26 " 'Secretary' means the Secretary of the Treasury or his delegate." 26 U.S.C. § 7701(a)(11) (1988).

The United States Court of Appeals for the Second Circuit reversed, finding that the amount tendered was sufficient. It held that "[s]ince [the owners] provided a legally-sufficient [timely] tender ... they were entitled to have [the purchaser] surrender the certificate of sale to them." Id.

In *Guthrie v. Curnutt*, 417 F.2d 764 (10th Cir.1969), the owner's agent went to the IRS office to redeem the property on the last day of the redemption period. The owner's agent "told the I.R.S. officer that he had been unable to locate the [purchaser] and offered to pay the required amount in cash or by a cashier's check. The I.R.S. officer refused the offer and told [owner's] agent that he would have to redeem from [the purchaser]." *Id.* at 765. The agent did not produce the required amount or present the check to the IRS officer. The following day, the purchaser told the owner that the redemption period had expired.

In a suit filed by the owner, "the trial court held that 'the tender to the IRS officer was timely and sufficient to effect redemption in compliance with the provisions of the *Code*,' and ordered that [the owner] be permitted to redeem." *Id.* On appeal, the purchaser argued that proper redemption requires that an owner or his or her agent actually produce the necessary amount and that the amount be offered to either the purchaser or the IRS officer. The court of appeals held that "[t]he failure of the agent to count out the cash or to present a cashier's check in the actual amount d[id] not destroy the tender." *Id.* It stated that "when a party, able and willing to do so, offers to pay another a sum of money and is told that it will not be accepted the offer is a tender without the money being produced." *Id.* at 765–66 (citations omitted). Consequently, the court of appeals affirmed the trial court's holding that because tender was timely and sufficient, the owner had complied with the statute and had the right to redeem his property. *Id.* at 766.

 Hence, in order to effect a proper redemption, an owner is required to make a sufficient and timely tender. Purchasers do not dispute that if Yamamoto's redemption was valid, it was for the proper amount and timely made. Purchasers received the required amount in July 1989. It is undisputed that Au spoke to Higashi after the tender. This phone call should have dispelled any doubt regarding Yamamoto's intent to redeem her property. Prior to September, there is no evidence that Higashi ever advised Au or Yamamoto of a possible problem with the redemption. Instead, before responding, Higashi held the check for two months. When Higashi did respond by letter, the letter was written on the 181st day after the tax sale. The redemption period is 180 days. Hence, by waiting to respond, Higashi prevented Yamamoto from clarifying any question regarding the redemption.[20] Such conduct cannot be countenanced under section 6337(b). *See Rosen, supra, Guthrie, supra.* Therefore, under the statute Yamamoto's redemption was effective upon tender of the purchase price plus interest.

2.

We further determine whether the fact that the redemption check was furnished by Hanalea or that Yamamoto conveyed the real property to Hanalea following the attempted redemption invalidates the redemption. This determination involves an examination of certain findings of fact and conclusions of law.

Findings of fact Nos. 21, 25, and 26 state in relevant part:

21. Yamamoto could not and was not acting on behalf of herself in the attempted redemption because she could not pay the sum required for the redemption.

25. The attempted redemption was ineffective and invalid because the redemption was not done by Yamamoto as the owner of the real property or by any person on behalf of Yamamoto. This Court believes that to hold otherwise would make the bidding process senseless. All that one would have to do is show up at the opening of the bid, figure out who the high bidder

---

**20.** The land court commented in its oral ruling that retaining the check from June 30 to September 15, 1989 was "good strategy."

was, offer the taxpayer fifty dollars to sign a letter which states that the person is acting on behalf of the taxpayer, and then send off a letter to the high bidder redeeming the property for the bid price plus fifty dollars. No one would bid under those circumstances. To hold otherwise would also undermine the policy of reducing the indebtedness of the taxpayer by obtaining the highest price possible for the sale of the taxpayer's property.

26. It was reasonable and proper for the Petitioners to reject the attempted rejection.

Conclusions of law Nos. 2 and 3 state in relevant part:

2. The attempted redemption by Hanalea through Au was ineffective and invalid.

3. The rejection of the redemption by Petitioners was reasonable and justified.

### a.

■ Subsection 6337(b)(2) sets out the amount the owner must pay the purchaser to redeem his or her property. This subsection does not condition an owner's redemption on any particular source of the payment price. All that is required is that the owner pay "the amount paid by such purchaser and interest thereon at the rate of 20 percent per annum." 26 U.S.C. § 6337(b)(2). There is nothing in the statute to prohibit an unsuccessful bidder or any other person from financing the owner's redemption. A contrary interpretation of the statute would unduly restrict an owner's ability to redeem because owners who lose their real property through a tax sale may lack the funds to redeem. One obvious way to raise the necessary amount, as Yamamoto did here, is to enter into an agreement with a party interested in the land who would provide benefits to her. Restricting the right to redeem, as the Purchasers propose, would be contrary to the general rule of interpreting the statute liberally as it applies to the owner.

We conclude that it is immaterial in determining whether property was redeemed under section 6337(b) that the funds for the redemption of property came from a party interested in acquiring the property from the owner, even if that party, like Hanalea, was

an unsuccessful bidder at the tax sale. The policy argument advanced by Purchasers and apparently adopted by the court in finding of fact No. 25 is without merit. Hanalea's actions do not undercut the bidding process. A potential bidder does not have an incentive to wait until after the tax sale to arrange a "deal" with the owner. Under an arrangement for redemption through the owner instead of an outright purchase, the land would still be burdened by all "liens, encumbrances, or conflicting claims which were previously operative" against the owner. *Samet,* 242 F.Supp. at 222. In contrast, the successful bidder receives all of the right, title, and interest of the owner, free and clear of all taxes and interests junior to the taxes. *See* 26 U.S.C. § 6339.

In *Taylor,* 72 A.F.T.R.2d 93–6577, the decedent's land was seized and sold by the IRS. The IRS sold the property to Jerry and Jaydene Page (the Pages). After the tax sale but before the redemption period ended, the decedent's personal representative entered into an agreement to sell the land to Robert and Dana Fowler (the Fowlers). *Id.* at 93–6578. In the land sale from the decedent's estate to the Fowlers, the escrow company, at closing, paid the Pages $52,134.02 from proceeds belonging to the Fowlers. *Id.* The Fowlers then recorded a quitclaim deed from the Pages to the Fowlers and a joint tenancy deed from the personal representative to the Fowlers. *Id.* The Fowlers in turn then sold the property to Scott and Karen Taylor (the Taylors), who eventually conveyed it to the plaintiff, Ms. Taylor's grandmother. Because the taxes of the decedent's estate were never satisfied, the IRS again seized the land. *Id.*

The propriety of the second seizure depended on whether the property had ever been redeemed under section 6337(b). *Id.* at 93–6579. If the property were treated as having been sold directly from the Pages to the Fowlers, then the IRS's second seizure was improper because a purchaser at a tax sale takes the property free of tax liens, and hence the Pages' sale to the Fowlers would not have been burdened by any tax liens. *Id.* However, if the property were treated as having been redeemed by the personal

representative and sold by the representative to the Fowlers, then the seizure was proper because a redemption would not extinguish any outstanding tax liens, and the Fowlers, as purchasers from the estate, took the property subject to the tax liens still on the property. *Id.*

The court held that the decedent's estate, through its personal representative, had redeemed the property and thereafter sold it to the Fowlers. *Id.* The court found it persuasive that the amount paid to the tax sale purchaser corresponded to the amount required under section 6337(b)(2). *Id.* at 93–6579–80. Although not expressly addressed by the court, we believe it significant that the court's primary concern when determining the validity of the redemption was the amount—not the source—of the funds.

b.

We also conclude that Yamamoto's conveyance of her property to Hanalea did not invalidate the redemption. The terms of the redemption statute only require that Yamamoto be an owner of the property at the time she exercised her right of redemption. Clearly, this requirement was met. Furthermore, there is nothing in the statute that limits Yamamoto's right to transfer her property once she redeems it. Redemption "restores the owner to his [or her] title as it stood before the sale[.]" *Samet,* 242 F.Supp.

at 222 (citation and internal quotation marks omitted).

In light of the policy of liberally construing the statute in favor of the property owner, we conclude that once Yamamoto exercised her redemption rights as the owner of the land, she had the right to deal with the property as her own. Redemption did not affect Yamamoto's right to dispose of the property in any manner she desired. In that sense, the devolution of the property after redemption vested Yamamoto with the sole discretion, as with all other incidents accruing to ownership, to transfer the property in whatever manner she chose to. Consequently, Yamamoto's subsequent conveyance to Hanalea did not invalidate her redemption.[21]

V.

For the foregoing reasons, we hold that the June 30, 1989 letter from Au to Purchasers constituted a valid redemption under section 6337(b). Therefore, we reverse the judgment filed on September 2, 1992, and remand this case to the court for proceedings consistent with this opinion.

---

21. Arguably, upon deeding the land to Hanalea, Yamamoto merely changed her status from owner to "any person having an interest in the land" who was still entitled to redeem under 26 U.S.C. § 6337(b)(1). However, a fair reading of the statute makes the status of the claimant at the time of the tax the relevant consideration.