## CORBETT *v.* NUTT.

1. Statutes authorizing redemption from sales for taxes, are to be construed favorably to the owners of the land, and particularly when such statutes provide full indemnity to the purchaser and impose a penalty on the delinquent.

2. Mrs. H., a resident at the time of Virginia, devised in April, 1863, certain lands situated in that State, and also other lands situated in the District of Columbia, to N., in trust for two married women. On bill filed by the *cestuis que trust*, the Supreme Court of the District of Columbia appointed M. trustee in place of N., and with the latter's powers and duties; *Held*—

   That although the appointment was invalid so far as the land in Virginia was concerned; and that M. was thus not legally trustee of *that* land, yet inasmuch as he was apparently clothed by the decree of the court appointing him with the legal title and acted as trustee, and was treated as such trustee by the *cestuis que trust*, the tax commissioners under the act of June 7th, 1862, to collect taxes in the insurrectionary districts, (and which provides that if the owner of land be under a legal disability the trustee or other person having charge of the person or estate of such owner may redeem the land sold for unpaid taxes), were authorized to allow him to redeem the lands in Virginia sold under the said act, in which such *cestuis que trust* were interested; that the commissioners were not obliged to inquire into the validity of the decree; and that it was sufficient for them to allow the redemption, when they found that the party offering to redeem furnished *primâ facie* evidence of possessing the character which entitled him under the statute to do so.

   That M. being thus clothed apparently with the legal title, and acting under his appointment with the consent of the *cestuis que trust*, was a person "having charge" of their estate, and was thus entitled to make redemption for them of the lands sold for taxes within the meaning of the said act.

3. The 7th section of the amendatory act of March 3d, 1865, which declares "that no owner shall be entitled to redeem unless, in addition to the oath prescribed by existing laws, he shall swear that he has not taken part with the insurgents in the present rebellion, or any way given them aid or comfort, and shall satisfy the board of commissioners that the said oath is true," applies only to owners seeking in person to redeem, and not to trustees, guardians, and agents redeeming for others whose property they have in charge.

4. The voluntary residence of a person within the Confederate lines during the late rebellion, did not incapacitate him, under the act of July 17th, 1862, "to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes" (which act makes null and void all *sales, transfers, and conveyances,* of any estate

and property, of persons engaged in armed rebellion against the United States, or aiding and abetting such rebellion, who after sixty days' warning and proclamation duly given and made by the President, did not cease to aid, countenance and abet such rebellion and return to their allegiance to the United States, and which act prescribes proceedings to condemn such property, and apply the proceeds to the support of the army), from making a last will and testament, further, if at all, than as against the United States.

5. Assuming (what is not decided) that a devise is within the terms "sales, transfers, and conveyances," invalidated by the act, and that a person who during the rebellion left loyal territory, and went to and resided in and died in the rebel lines, is within the category of persons for whom the warning and proclamation of the President prescribed by the act was intended, the invalidity declared is to be regarded as limited, and not absolute; and it is only as against the United States that the "sales, transfers, and conveyances," of property liable to seizure, are null and void. They are not void as between private persons, or against any other party than the United States.

6. Where land sold under the said act of June 7, 1862, has been redeemed, the owner is entitled to recover it from the purchaser at the tax sale, without showing that the certificate of redemption has been forwarded to the Secretary of the Treasury, and that the purchaser has been paid his purchase-money by draft drawn on the treasury of the United States.

ERROR to the Supreme Court of Appeals of Virginia; the case being thus:

The seventh section of the act of June 7th, 1862, for the collection of direct taxes in insurrectionary districts, after directing the advertisement and sale of lands, upon which taxes due the United States remained unpaid, after a time specified, enacts*—

By a first clause, that the *owner* of the land, or any loyal person of the United States having any interest in it, may at any time, *within sixty days after the sale,* appear before the board of tax commissioners, in proper person, and redeem it from sale upon paying the amount of the tax and penalty, with the interest and expenses prescribed, and taking an oath, if a citizen, to support the Constitution of the United States.

And by a second clause, that if the owner of the land be

---

* 12 Stat. at Large, 423, 424.

*under a legal disability*, the *trustee*, or other person *having charge* of the person or estate of such owner, may redeem *at any time within two years after the sale.*

An act of March 3d, 1865, amendatory of the act just mentioned, enacts that when a redemption is made the board of tax commissioners shall certify the fact to the Secretary of the Treasury, and that he shall repay the purchaser, by draft on the treasury, the principal and interest of the purchase-money; and that the purchaser shall deliver possession to the owner redeeming.

It also enacts,* " that no *owner* shall be entitled to redeem unless, in addition to the oath prescribed by existing laws, he shall swear that he has not taken part with the insurgents in the present rebellion, or any way given them aid or comfort, and shall satisfy the board of commissioners that the said oath is true."

An act of July 17th, 1862, originating like the other two in the exigencies of the late civil war, and entitled "An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes," enacts by its fifth section,† that " to insure the speedy termination of the present rebellion, it shall be the duty of the President of the United States to cause the seizure of all the estate and property, money, stocks, credits, and effects of the persons " thereinafter named, " *and to apply and use the same, and the proceeds thereof, for the support of the army of the United States.*"

The section then enumerates six classes of persons whose property is thus made subject to seizure. The fourth class embraces persons " who, having held an office of honor, trust, or profit under the United States, shall thereafter hold office in the so-called Confederate States."

The sixth section enacts that if any person within any State or Territory of the United States, other than those named in the previous section, being engaged in armed rebellion against the United States, or aiding or abetting such

---

* 13 Stat. at Large, 502.          † 12 Id. 590.

rebellion, shall not, within sixty days after public warning and proclamation by the President of the United States, cease to aid, countenance, and abet such rebellion, and return to his allegiance to the United States, all·the estate and property, money, stocks, and credits of such person shall be liable to seizure as aforesaid, and it shall be the duty of the President to seize and use them as aforesaid, or the proceeds thereof.

It continues:

" And *all sales, transfers, or conveyances* of any such property, after the expiration of the said sixty days from the date of such warning and proclamation, *shall be null and void;* and it shall be a sufficient bar to any suit brought by such person for the possession or the use of such property, or any of it, to allege and prove that he is one of the persons described in this section."

[The proclamation of the President was made July 25th, 1862.]

The seventh section directs the proceedings to be instituted for the condemnation and sale of the property seized.

With these enactments of June and July, 1862, in force, Mrs. Louisa Hunter died, April, 1863, seized of a tract of land consisting of sixty acres, situated in the county of Alexandria, in the State of Virginia, leaving a last will and testament, by which she devised the premises, along with certain real estate in the city of Washington, to one W. D. Nutt, in trust for Marion Young, her adopted daughter, and Emily Featherstonaugh, her niece, both of whom were then and still are married women.

Prior to the war Mrs. Hunter resided in the county of Alexandria, in Virginia, but after the occupation of Alexandria by the forces of the United States, she went within the Confederate lines, and there remained until her death.

Immediately preceding the commencement of the war, Nutt held an office under the government of the United States. This he resigned in February, 1861, and in September following went within the Confederate lines, and took

office under the Confederate government, which he held at the time of Mrs. Hunter's death.

On the 29th of February, 1864, the land in *Virginia* was sold for taxes due the United States under the first of the above quoted acts of Congress, the act, namely, of June 7th, 1862, providing for the collection of direct taxes in insurrectionary districts within the United States.; and at the sale one W. P. Corbett became the purchaser, received the commissioners' certificate of sale, and took possession of the premises under the title thus acquired.

In July, 1865, the *cestuis que trust*, under the will of Mrs. Hunter, filed a bill in the Supreme Court of *the District of Columbia* to obtain the appointment of a new trustee in place of the one named in the bill, setting forth that the testatrix had left a large and valuable estate, the greater part of which lay within the District; that the settlement of the estate was impossible, by the terms of the will, without the intervention of the trustee named therein, or another in his stead, invested with his powers and duties; and that they were informed that the trustee named declined to qualify, or to accept the trusts reposed in him.

Nutt appeared to the suit and answered the bill, admitting that he was the person named in the will, and that he had declined to accept the trust thereunder. The court thereupon, at the hearing, adjudged that the complainants, the *cestuis que trust*, were entitled to the relief prayed, and by its decree appointed J. D. McPherson, of Washington, D. C., trustee, in " the name, place, and stead," " clothed with all the powers and charged with all the duties reposed and vested in said Nutt as trustee, by the testatrix mentioned in the will," first requiring of him the execution of a bond in the penal sum of ten thousand dollars, conditioned for the faithful performance of his trust.

On the 10th of February, 1866, McPherson, as trustee, appeared before the tax commissioners and paid to them the several sums required for the purpose of effecting a redemption of the property from the tax sale, and received from them a certificate of redemption, stating the payments made

by him, and that he had taken an oath to support the Constitution of the United States; and that Marion Young and Emily Featherstonaugh, owners of the property, and married women at the time of the sale, and still under the same disability, had sworn that they had not taken part with the insurgents in the rebellion, or in any way given them aid or comfort, and had satisfied the commissioners that the oath was true.

Nutt, the trustee appointed by Mrs. Hunter's will, now brought suit in one of the State courts of Virginia to recover the property, and on the trial offered in evidence the certificate of redemption against the objection of the defendant that the redemption was illegal and did not sustain the claim of the plaintiff. The court admitted it. To this ruling of the court the defendant excepted.

The testimony being closed, the defendant requested instructions thus:

1. If the jury shall believe from the evidence that Nutt, the plaintiff, who sues as trustee, held a position under the government of the United States, and resigned said office, went voluntarily within the lines of the Confederate States, and accepted office under the Confederate government, and held said office at the time of the death of the testatrix, and that the said Louisa Hunter was a resident of the county of Alexandria at the time of the breaking out of the civil war, and after its breaking out went voluntarily into the Confederate lines and resided therein up to the time of her death, and that the premises in the summons described were at all times in the military lines and under the jurisdiction of the United States, then that said devise to the plaintiff was inoperative to pass or transfer any title to him, and he cannot therefore recover in this action.

2. That to enable the plaintiff to recover in this action, he must show that the certificate of redemption was forwarded to the Secretary of the Treasury, and the defendant repaid his purchase-money by draft drawn on the treasury of the United States.

The object of the instruction prayed, the defendant stated

in his petition to the Court of Appeals of Virginia, was to raise the question as to the effect and meaning of the sixth section of the above-quoted act of Congress of the 17th of July, 1862, " to suppress insurrection, punish treason," &c.

The court refused to give the instructions thus asked for, and the defendant excepted. Verdict and judgment having gone for the plaintiff, the case was taken to the Supreme Court of Appeals of Virginia, which sustained the judgment. The case was now brought here under the 25th section of the Judiciary Act; the only ground of error alleged in this court being that there was drawn in question the construction of,

1st. The act of Congress of June 7th, 1862, " for the collection of direct taxes in the insurrectionary districts within the United States, and for other purposes."

2d. The act passed July 17th, 1862, " to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes."

3d. The act of March 3d, 1865, amendatory of this last act.

And that the decision of the Supreme Court of Appeals of Virginia was adverse to the right and title claimed under the said acts.

*Messrs. G. W. Brent and C. W. Wattles, for the plaintiff in error:*

One of several points argued and passed on in the court below, was of course the point whether, after his answer in the Supreme Court of the District, that he had declined to accept the trusts under Mrs. Hunter's will, Nutt was still trustee and could maintain a suit to recover the land, even admitting that the redemption was rightly made. If that matter is open in this court, it deserves consideration. Passing it by, however, we come to the matters excepted to.

1. *As to the evidence.* The certificate ought to have been excluded, for it proved on its face that the redemption was bad. It describes McPherson as " trustee." But he was not trustee of *this* land, for the court of the District of Co-

lumbia could not appoint a trustee for lands in Virginia; and as trustee of *such* land he had no power to redeem. It is in vain to say that he redeemed as a person "having charge" of the person or estate of the owner. The case does not show that he had any charge of this land, in another State, still held in trust by a recognized trustee, if this suit is rightly brought by Nutt. On the contrary, as trustee of land in the District alone, he could have no lawful charge of the other land; and the fact of Nutt's now bringing suit, indicates rather that *he,* if any one, and not McPherson, had the care of it. There is nothing which shows any relation in McPherson to the two ladies except as he got it from the court in the District, which could not give him charge of lands out of it.

2. *As to the instructions refused.* The first one should have been given. The act of 17th July, to suppress insurrection, &c., makes by plain terms "null and void" "all sales, transfers, and conveyances" of persons "aiding and abetting" the rebellion; and by it Mrs. Hunter was prevented from selling, transferring, or conveying any estate and Nutt from accepting any. When Mrs. Hunter left loyal territory to go, and went, into the rebel lines, she became a rebel, for it has been settled that all the citizens of the rebel "government" became enemies to the United States.* Moreover, a person holding by devise, holds, in the language of the law, "by purchase." Where there has been a purchase, there has, of necessity, been a sale. And, without resort to technical rules, a devise must be admitted to be "a transfer." It has been decided to be "a conveyance."† We have thus the case of a rebel, "selling, transferring, conveying;" and of an office-holder, who transfers the scene of his office-holding, attempting to take. But the statute declares all "null and void." It cannot be said that no one but the United States can object. The statute was a measure of war. It comes, and was meant to come like "a tyrant;"

* Mrs. Alexander's Cotton, 2 Wallace, 404; The Venice, Ib. 258.
† Seaburn *v.* Seaburn, 15 Grattan, 423.

its purpose was to inflict the greatest · possible injury; to make war short, by making it sharp and decisive. Office found may be dispensed with by the sovereign;[*] and under this statute it was dispensed with, and the invalidity of the transfer is allowed to be taken advantage of by any one concerned.

The second instruction refused should also have been given. The object of the provision in the amendatory act of March 3d, 1865, is twofold. First, to protect the treasury; secondly, to benefit the purchaser. It invests the secretary with a superintendency or revisory power over the tax commissioners. Before the owner is entitled to possession the secretary must be satisfied that the lands have been duly redeemed, and on being so satisfied he repays the purchaser, and not until then is the owner entitled to the possession.

*Messrs. Carlisle and McPherson, contra:*

The matter of Nutt's right to sue was a matter of local law decided affirmatively below, and not open as a Federal question for discussion here. We proceed to the exceptions.

1. Selling land for taxes with no actual notice to owners, is an extreme exercise of sovereign power; and as authorities show, the right of redemption being a right in favor of property, is to be liberally construed. Courts support it, and have presumed and intended against many probabilities in support of it.[†] Now here it is sufficiently plain that McPherson had charge of this land. The oaths of the ladies made in furtherance of his purpose to redeem, show that at the time he redeemed he did have charge, and had it by their assent, for they were acting in furtherance of his purpose as he was of theirs. From the time of his appointment as trustee by the court of the District, his relation was necessarily confidential to them both. What so natural as that he, who had their moneys from the District property, should be in charge of property near it; the "trustee" of it de-

---

[*] Smith v. Maryland, 6 Cranch, 286.

[†] Patterson v. Brindle, 9 Watts, 100; Gault's Appeal, 33 Pennsylvania State, 94; Dubois v. Hepburn, 10 Peters, 1.

clining to take actual charge, and McPherson not being able under his appointment to act as *trustee* in his place? The statute does not speak of the time when the charge is to begin. If it be within two years, it is enough. The certificate was then rightly admitted.

2. The instructions asked for were rightly refused. There was no condemnation under the seventh section by the government. This justified the refusal of the first one.* And the request for the second proceeds on a misconception of the act on which the request was founded.

Mr. Justice FIELD delivered the opinion of the court.

Several questions were raised and elaborately examined in this case in the courts of Virginia, both in the lower courts and in the Court of Appeals of the State, which are not open for consideration here. The only questions which we can consider, under the twenty-fifth section of the Judiciary Act, arise upon the ruling of the court admitting the certificate of redemption issued to McPherson, and the refusal to give certain instructions prayed by the defendant.

The seventh section of the act of June 7th, 1862, for the collection of direct taxes in insurrectionary districts, after directing the advertisement and sale of lands, upon which taxes due the United States remained unpaid, after a designated period, contains two clauses relating to the redemption of the land from such sale.† The first clause provides that the owner of the land, or any loyal person of the United States having any valid lien upon or interest in the land, may at any time, within sixty days after the sale, appear before the board of tax commissioners, in proper person, and redeem the land from sale upon paying the amount of the tax and penalty, with the interest and expenses prescribed, and taking an oath, if a citizen, to support the Constitution of the United States. The second clause provides that if the owner of the land sold be a minor, a non-resident alien, a loyal citizen beyond the seas, a person of unsound mind, or under a legal

---

* Fairfax *v.* Hunter, 7 Cranch, 603.     † 12 Stat. at Large, 423, 424.

disability, the guardian, trustee, or other person having charge of the person or estate of such owner, may, in the same manner and with like effect, redeem the land at any time within two years after the sale.

By these provisions persons entitled to make redemption are divided into two classes. The first class embraces persons who are residents in the country, and are not laboring under any legal disability. They may well be supposed to have had personal knowledge of the assessment of the taxes and of the sale made, and for this reason, it may be inferred, their privilege of redemption was limited by Congress within the narrow period prescribed.

The second class embraces loyal citizens beyond the seas, non-resident aliens, and persons laboring under some legal disability, to whom the reason for the limitation prescribed to the first class was not applicable. To those absent from the country, personal knowledge, either of the assessment or sale, could not be justly imputed; and those under disability, if possessed of the knowledge, might reasonably expect that the matter would receive the attention of the parties intrusted with the charge of the property. Congress, therefore, gave to the persons of this class a much more extended period within which to exercise the privilege of redemption, and allowed the redemption to be made by " the guardian, trustee, or other person having charge of the person or estate " of the owner. The position of the persons composing this class, absent from the country, or under legal disability, was such that their property would, in the ordinary course of things, be in the " charge" of others, but, lest the latter might, from any cause, neglect the interests of the owners, the period of redemption was prolonged to two years. It was for the benefit of the owners of the property, that they might not suffer from the remissness or faithlessness of their guardians, trustees, or agents, that the privilege was thus extended, and to secure that benefit the act should be liberally construed. It is the general rule of courts to give to statutes authorizing redemption from tax sales a construction favorable to owners, particularly when

they provide, as in the present case, full indemnity to the purchaser, and impose a penalty upon the delinquent.*

In this case it appears to be conceded that the Supreme Court of the District of Columbia exceeded its authority in appointing McPherson trustee, in place of Nutt, of the land in Virginia. That court could not by the mere force of its decree transfer the title to land lying without its jurisdiction from the party in whom it was vested by the will of Mrs. Hunter. A court of equity acting upon the person of a defendant may control the disposition of real property belonging to him situated in another jurisdiction, and even in a foreign country. It may decree a conveyance and enforce its execution by process against the defendant, but neither its decree nor any conveyance under it, except by the party in whom the title is vested, is of any efficacy beyond the jurisdiction of the court. This is familiar law, and was declared by this court in *Watkins* v. *Holman*,† the court observing that "no principle was better established than that the disposition of real estate, whether by deed, descent, or by any other mode, must be governed by the law of the state where the land is situated."

McPherson was not, therefore, legally trustee of the property in Virginia, and if his right to interpose for the redemption depended upon the possession of the legal title, his action might be treated as that of a stranger to the land. But the absolute possession of such title by him was not essential under the circumstances. He regarded himself as trustee of the property. The *cestuis que trust* so regarded him. He professedly acted in their behalf and for their interests. He was apparently, from the decree of the Supreme Court of the District, clothed with the legal title. The commissioners treated him as a person entitled to make the redemption. They were not obliged to inquire into the validity of the decree. They were not expected to enter upon investigations of title any further than was necessary to prevent the impertinent intermeddling of strangers. It was

---

* Dubois *v.* Hepburn, 10 Peters, 22.    † 16 Peters, 57.

sufficient for the commissioners to allow the redemption, when they found that the party offering to redeem furnished *primâ facie* evidence of possessing the character which entitled him under the statute to make the redemption.

The trustee named in the will not having accepted the trust reposed in him when the decree of the Supreme Court of the District was made, it is reasonable to suppose from the subsequent conduct of McPherson that he immediately took actual charge of the estate for the *cestuis que trust*, and was in such charge when the redemption was made. If such were the case, and we think there is little doubt of it, McPherson was by the very words of the statute authorized, without regard to the validity of the decree, as a person. "having charge" of the estate of the owners, who were laboring under disability by reason of their coverture, *to* make the redemption; although from the ineffectual parol disclaimer of his trust by Nutt, the legal title may have remained in the latter, which required the present action for the recovery of the property to be brought in his name.

It is further objected that, assuming that McPherson was entitled to redeem, the redemption was ineffectual because he did not take the oath required by the seventh section of the amendatory act of March 3d, 1865, which declares "that no owner shall be entitled to redeem unless, in addition to the oath prescribed by existing laws, he shall swear that he has not taken part with the insurgents in the present rebellion, or any way given them aid or comfort, and shall satisfy the board of commissioners that the said oath is true."*

But the objection is untenable. McPherson did not redeem as owner, but as trustee of the owners, or as a person "having charge" of their property. The act of 1862 distinguishes between owners appearing in their proper persons and redeeming, and owners beyond the seas or laboring under some legal disability and redeeming through trustees, guardians, or persons having charge of the property.† It

---

* 13 Stat. at Large, 502.         † 12 Stat. at Large, 423–4.

requires both of the owners redeeming in person, and of the trustees, guardians, and agents redeeming for others, an oath to support the Constitution of the United States. It specifies the taking of the oath as one of the terms on which the redemption can be made by owners and loyal persons having a lien upon or interest in the property sold, when appearing in person before the commissioners. And it subsequently authorizes a redemption by trustees, guardians, and parties acting for others, "in the manner above provided;" that is, by making the like payments and taking a similar oath. But the additional oath imposed by the act of 1865 is, in our judgment, required only of owners seeking in person to redeem. It declares that "no owner shall be entitled to redeem" unless he take the additional oath. If the requirement extended also to owners beyond the seas or laboring under legal disability, it could not in many cases be complied with, and the beneficial object of the act, which was to secure to them the right of redemption, would be defeated.

We have not overlooked the fact that, in the present case, the certificate of redemption states that the additional oath was taken by the owners. This circumstance is not entitled to weight because the owners do not themselves make the redemption; and if they could be themselves considered as redemptioners, they failed to take the oath to support the Constitution required by the act of 1862.

We proceed to consider the prayers for instructions presented by the defendant and refused by the court. By the first of these prayers the court was requested to declare, in effect, that the voluntary residence of the testatrix within the Confederate lines incapacitated her from making a last will and testament; and the resignation by the plaintiff of an office under the United States, and acceptance of an office under the Confederate government incapacitated him from acting as trustee under her will, and taking the devise in that capacity.

The object of the instruction prayed, says the defendant

in his petition to the Court of Appeals of Virginia, was to raise the question as to the effect and meaning of the sixth section of the act of Congress, passed on the 17th of July, 1862, entitled "An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes."

The previous section of the act provides that, " to insure the speedy termination of the present rebellion, it shall be the duty of the President of the United States to cause the seizure of all the estate and property, money, stocks, credits, and effects of the persons" thereinafter named, "and to apply and use the same, and the proceeds thereof, for the support of the army of the United States."*

The section then enumerates six classes of persons whose property is thus made subject to seizure. The fourth class embraces persons "who, having held an office of honor, trust, or profit under the United States, shall thereafter hold office in the so-called Confederate States." The section concludes by declaring that "all sales, transfers, or conveyances of any such property shall be null and void."

The sixth section provides that if any person within any State or Territory of the United States, other than those named in the previous section, "being engaged in armed rebellion against the United States, or aiding or abetting such rebellion, shall not, within sixty days after public warning and proclamation duly given and made by the President of the United States, cease to aid, countenance, and abet such rebellion, and return to his allegiance to the United States, all the estate and property, moneys, stocks, and credits of such person shall be liable to seizure as aforesaid, and it shall be the duty of the President to seize and use them as aforesaid, or the proceeds thereof.

"And all sales, transfers, or conveyances of any such property, after the expiration of the said sixty days from the date of such warning and proclamation, shall be null and void; and it shall be a sufficient bar to any suit brought by

---

* 12 Stat. at Large, 590.

such person for the possession or the use of such property, or any of it, to allege and prove that he is one of the persons described in this section."

The seventh section of the act directs the proceedings to be instituted for the condemnation and sale of the property seized.

If the devise of Mrs. Hunter can be brought within the language of this last section, it must be because a devise is embraced within the terms " sales, transfers, and conveyances;" and because her " aiding and abetting " the rebellion, and her refusal to return to her allegiance to the United States, are legitimate and necessary inferences from her voluntary and continued residence within the Confederate lines, for there is no direct evidence on either of these latter points, nor any evidence tending to establish either of them except such voluntary residence. Assuming, however, that a devise is within the " sales, transfers, and conveyances" invalidated by the act, and that Mrs. Hunter is within the category of persons for whom the warning and proclamation of the President were intended, we are of the opinion that the invalidity declared is limited and not absolute; that it is only as against the United States that the " sales, transfers, and conveyances" of property liable to seizure are null and void; and that they are not void as between private persons, or against any other party than the United States.

The object of the provisions cited is manifest. It is declared, in express terms, to insure the speedy termination of the existing rebellion. The confiscation of the property of persons engaged in the rebellion, and the appropriation of it, or its proceeds, to the support of the army of the United States, were supposed to have a tendency to advance that object. The seizure of the property of particularly designated classes, and of others engaged in the rebellion, or aiding and abetting it, who should not heed the public warning and proclamation of the President, was therefore directed, as also the institution of proceedings required in the courts of the United States for its condemnation and sale.

It was to prevent these provisions from being evaded by

the parties whose property was liable to seizure that " sales, transfers, and conveyances" of the property were declared invalid. They were null and void as against the belligerent or sovereign right of the United States to appropriate and use the property for the purpose designated, but in no other respect, and not as against any other party. Neither the object sought, nor the language of the act, requires any greater extension of the terms used. The United States were the only party who could institute the proceedings for condemnation; the offence for which such condemnation was decreed was against the United States, and the property condemned, or its proceeds, went to their sole use. They alone could, therefore, be affected by the sales.

Any other construction would impute to the United States a severity in their legislation entirely foreign to their history. No people can exist without exchanging commodities. There must be buying and selling and exchanging in every community, or the greater part of its inhabitants would have neither food nor raiment. And yet the argument of the defendant, if good for anything, goes to this extent, that by the act of Congress "all sales, transfers, and conveyances" of property of the vast numbers engaged in the late rebellion against the United States, constituting the great majority of many towns, and cities, and even of several states, were utterly null and void; that even the commonest transactions of exchange in the daily life of these people were tainted with invalidity. It is difficult to conceive the misery which would follow from a legislative decree of this wide-sweeping character in any community, where its execution was conceived to be possible, or confidence was reposed in its validity.

We do not notice that part of the instruction prayed which relates to the status of the plaintiff as an office-holder under the United States just previous to the commencement of the war, and subsequently taking office under the Confederate government, as it was not his property, the sale of which is assailed. If he was incapable of taking the devise, it was not from his participation in the rebellion, but because

the testatrix was incapable of passing her property by will under the act of Congress, a position which we have already shown to be untenable.

The second, and the only other prayer for instruction presented by the defendant, and refused by the court, which we can take notice of, is this: "That to enable the plaintiff to recover he must show that the certificate of redemption was forwarded to the Secretary of the Treasury, and the defendant repaid his purchase-money by a draft drawn on the Treasury of the United States." This prayer was based upon a misapprehension of the seventh section of the act of Congress of March 3d, 1865,* which provides that when a redemption is made the board of tax commissioners shall certify the fact to the Secretary of the Treasury, and the secretary shall repay the purchaser, by draft on the treasury, the principal and interest of the purchase-money; and that the purchaser shall deliver possession to the owner redeeming. These provisions only prescribe the duty both of the secretary and purchaser when the redemption is made, but they do not make the performance of the duty of the purchaser dependent upon the previous performance of the duty resting on the secretary. The act was intended for the benefit of the purchaser, to enable him to obtain the repayment of the purchase-money and interest thereon; but the validity of the redemption does not depend upon such repayment. That is a matter between the purchaser and the secretary, with which the owner or redemptioner has no concern.

We find no error in the record, and the judgment of the Supreme Court of Appeals of Virginia must be, therefore,

AFFIRMED.

---

* 13 Stat. at Large, 502.