# Supreme Court of Texas

No. 24-0438

Braxton Minerals III, LLC,

*Petitioner*,

v.

Robert Scott Bauer and Braxton Minerals II, LLC,

*Respondents*

On Petition for Review from the
Court of Appeals for the Second District of Texas

**Argued November 6, 2025**

CHIEF JUSTICE BLACKLOCK delivered the opinion of the Court.

An Oklahoma plaintiff sued Texas defendants who allegedly failed to convey mineral rights as promised. The court of appeals held that Texas courts lack jurisdiction over the suit because the mineral rights are in West Virginia. We disagree. As we said one hundred and thirty years ago, "[i]f a person be under contractual obligation to convey lands, a court of equity having jurisdiction over his person may compel him to make the necessary conveyance, although the land is in another

state." *Tex. & Pac. Ry. v. Gay*, 26 S.W. 599, 605 (Tex. 1894). This is just as much the law today as it was then.

This suit does not seek, nor would a Texas court have the power to give, an *in rem* judgment establishing ownership of West Virginian real property in an absolute sense, as against the world. Instead, like almost all civil litigation, this suit seeks an *in personam* judgment adjudicating the parties' rights as against each other, requiring the defendants to honor their alleged agreement, and binding only the parties. A Texas court with personal jurisdiction over the parties does not lack subject-matter jurisdiction over so familiar a suit merely because ownership of foreign real estate is at issue. The court of appeals' judgment is reversed. The case is remanded for consideration of remaining issues the court of appeals did not reach.

**I.**

Robert Bauer is a Texan who buys and sells mineral rights across the country through a multitude of corporate entities. In May 2015, Bauer hired Brad Ashburn, another Texan. A few months later, Bauer and Ashburn formed a new entity, Braxton Minerals II (BM2).

In October 2015, Bauer and Ashburn met with EnerQuest Oil & Gas to discuss the purchase of mineral rights in Appalachia. They formed an Oklahoma company for that purpose, Braxton Minerals III (BM3). EnerQuest would own 75% of BM3. Bauer and Ashburn, acting through a company called Braxton Minerals-Appalachia (BMA), would own the rest. EnerQuest contributed $10 million to BM3, while Bauer and Ashburn agreed to sell certain mineral rights held by BM2 to BM3

2

according to an agreed-upon schedule. These terms and others are reflected in BM3's Company Agreement.

Upon its formation, BM3 purchased various mineral rights from BM2. Later opportunities to purchase mineral rights came in the form of "draw requests." Ashburn, acting on behalf of BMA, would send a draw request to EnerQuest, which funded BM3's purchases. If the mineral rights described in the request met previously agreed-upon criteria, EnerQuest would approve the request and provide funds to purchase the rights for BM3. From November 2015 to April 2016, Ashburn sent eleven draw requests to EnerQuest. Two of those requests sparked this litigation. In both instances, Ashburn sent EnerQuest a draw request for BM3's purchase of mineral rights. EnerQuest approved both requests. Thirty mineral deeds were purchased in these two transactions, although nineteen deeds ended up reflecting BM2 as the grantee, not BM3. This resulted in royalty payments to BM2 instead of BM3.

BM3 asked Bauer to correct the deeds to list BM3 as the grantee. Bauer refused. BM3 then sued Bauer and BM2 in Tarrant County. BM3's live petition requests a variety of relief, including: (1) reformation of nineteen mineral deeds to reflect BM3 as grantee; (2) specific performance of the parties' agreements; (3) declaratory judgment affirming BM3's ownership of the disputed mineral rights and entitlement to royalties therefrom; (4) a constructive trust over the deeds and all royalty payments; and (5) an injunction prohibiting Bauer and BM2 from transferring the deeds or the royalty payments. Bauer and BM2 filed a counterclaim alleging that BM3, at the direction of

Ashburn, defrauded BM2 and avoided paying for the mineral rights. Bauer and BM2 sought dismissal of BM3's suit under the theory that a Texas court lacks jurisdiction to determine title to real property outside Texas. The district court denied the motion. BM3 moved for summary judgment on both its claims and the counterclaims. The court granted summary judgment to BM3, again rejecting the notion that it lacked jurisdiction for territorial reasons.

The judgment awards BM3 much of the requested relief. It orders Bauer and BM2 to perform their contractual obligations, to convey the disputed mineral rights and related royalties, and to reform the nineteen incorrect deeds. It then declares BM3 the rightful owner of certain royalty interests. It enjoins Bauer and BM2 from transferring, selling, or otherwise disposing of the nineteen mineral deeds and related royalties. It also awards damages, attorney's fees, and other litigation costs to BM3. It does not impose a constructive trust.

The court of appeals reversed, dismissing the case for want of jurisdiction because the mineral rights at issue are in West Virginia. 689 S.W.3d 633, 646 (Tex. App.—Fort Worth 2024). The court acknowledged that Texas courts with personal jurisdiction over a party "may enforce [the] party's personal or contractual obligation that indirectly involves property in another state." *Id.* at 637. Even so, the court applied a rule that has developed in some courts of appeals, under which Texas courts lack jurisdiction if "the gist or gravamen of a claim involves adjudication of title to foreign real property interests." *Id.* Under this rule, jurisdiction is lacking if disputed ownership of foreign real property is "more than incidental or collateral" to the plaintiff's

4

claims. *Id.* In the court of appeals' view, because the gist of BM3's "allegations revolve[s] around its claims of ownership of the mineral interests in question," the suit was an impermissible attempt to have a Texas court adjudicate title to non-Texas real estate. *Id.* at 639. Having concluded it lacked jurisdiction, the court of appeals appropriately declined to address the appellants' merits arguments. *Id.* at 646.

BM3 petitioned for review. Its primary contention is that the "gist" rule applied by the court of appeals contravenes this Court's precedent and obscures the true jurisdictional line of demarcation, which is whether a claim involving foreign property seeks a judgment *in personam* or *in rem*. BM3 contends its suit is an *in personam* action within the jurisdiction of a Texas court even though its claims implicate questions of ownership of West Virginia minerals. Bauer and BM2 disagree and defend the court of appeals' application of the "gist" rule. We granted the petition.

## II.

On at least three occasions, we have confronted the contention that courts lack jurisdiction over a suit involving foreign property. *Gay*, 26 S.W. at 605–06; *Holt v. Guerguin*, 163 S.W. 10, 12 (Tex. 1914); *McElreath v. McElreath*, 345 S.W.2d 722, 727–29 (Tex. 1961). None of these decisions suggests the "gist" rule used below. Each of them, instead, turns on the classical distinction between suits *in personam* and suits *in rem*.

As the terminology suggests, the distinction between suits *in personam* ("against the person") and suits *in rem* ("against the thing")

5

dates at least to Roman law.[1]  In modern usage, a suit *in personam* is one "[i]nvolving or determining the personal rights and obligations of the parties." *In Personam*, BLACK'S LAW DICTIONARY (12th ed. 2024).  A suit *in rem* is one "[i]nvolving or determining the status of a thing, and therefore the rights of persons generally with respect to that thing." *In Rem*, BLACK'S LAW DICTIONARY (12th ed. 2024).  Unlike an *in personam* judgment, which binds only the parties and those in privity with them, a judgment *in rem* "affects the interests of all persons in the world in the thing."  *City of Conroe v. San Jacinto River Auth.*, 602 S.W.3d 444, 458 (Tex. 2020) (quoting *Bodine v. Webb*, 992 S.W.2d 672, 676 (Tex. App.—Austin 1999, pet. denied)).  Most modern civil lawsuits seek only *in personam* relief.  Examples of *in rem* suits, which are relatively rare, include actions to try title and civil asset forfeitures.  *See, e.g.*, *Permian Oil Co. v. Smith*, 107 S.W.2d 564, 584 (Tex. 1937); *State v. Silver Chevrolet Pickup VIN 1GCEC14T7YE257128 Tag No. 3TMX16*, 140 S.W.3d 691, 692 (Tex. 2004).

As discussed below, our decisions in *Gay*, *Holt*, and *McElreath* together illustrate a sound rule that long pre-dated them and that continues in force today: While courts lack jurisdiction over *in rem* suits about foreign property, there is generally no jurisdictional impediment to *in personam* suits about foreign property, assuming the court has jurisdiction over the parties.  *Gay*, 26 S.W. at 605–06.  These precedents, and the deeply rooted legal categories on which they rely, provide ample grounding for today's decision.

---

[1] GAIUS, INSTITUTES 4.1–16 (discussing actions *in personam* and actions *in rem*).

## A.

To say that early cases of this Court introduced the *in personam/in rem* distinction into Texas law would not be correct. These categories were already in the bloodstream of the body of English law the first Texans adopted shortly after their independence. REPUB. TEX. CONST. of 1836, art. IV, § 13; Act approved Jan. 20, 1840, 4th Cong., R.S., § 1, 1840 Repub. Tex. Laws 3, 3–4; *see generally* JOHN C. TOWNES, PLEADING IN THE DISTRICT AND COUNTY COURTS OF TEXAS 34 (1901).

Perhaps the seminal English case, at least in terms of its impact on American law, is *Penn v. Lord Baltimore*. (1750) 27 Eng. Rep. 1132; 1 Ves. Sen. 444 (LC). The plaintiff sought enforcement of an agreement about the boundary between the colonies of Pennsylvania and Maryland. *Id.* at 1132–33. The defendant objected that the chancery court, exercising equity powers, had no authority to establish the boundary, as this power belonged to the King. *Id.* at 1133. Lord Chancellor Hardwicke acknowledged the court's lack of jurisdiction over "the original right of the boundaries" but reasoned that the case did "not stand in need of that." *Id.* at 1134. Instead, its resolution required only vindication of the parties' agreement through an *in personam* decree enforceable "by process of contempt" against the defendant. *Id.* at 1138–39.

Lord Hardwicke was keenly concerned with the *in personam/in rem* distinction because the equity powers of the English chancery court on which he served extended only to *in personam* decrees. *Id.* at 1133–35. Although jurisdictional distinctions between law and equity have receded from our focus, *Penn* presages the broader principle

7

that a court's power to enforce the agreements of parties within its jurisdiction does not yield when those agreements concern ownership of land outside the court's jurisdiction.

The United States Supreme Court embraced that principle in *Massie v. Watts*, which relies in part on what it calls "the celebrated case" of *Penn v. Lord Baltimore*. 10 U.S. 148, 158 (1810). A Virginian sued a Kentuckian in federal court in Kentucky to compel the conveyance of land in Ohio. *Id.* at 157–59. According to the plaintiff, the defendant agreed to conduct a survey of the land for the plaintiff but instead fraudulently obtained a deed to the land for himself. *Id.* at 157–62. The lower court ordered the defendant to convey the land in Ohio to the plaintiff, but the defendant contended that the Kentucky court did not have jurisdiction over a case involving title to Ohio land. *Id.* at 156.

The Supreme Court affirmed the judgment. *Id.* at 158–63. Chief Justice Marshall explained that courts lack jurisdiction over suits involving a "naked question of title" to land beyond their territorial borders—that is, suits *in rem*. *Id.* at 158. But "where the defendant in the original action is liable to the plaintiff, either in consequence of contract, or as trustee," the historic "principles of equity give a court jurisdiction wherever the person may be found." *Id.* The proper inquiry was "whether this [was] an unmixed question of title" and therefore a suit *in rem* concerning foreign property, or "a case of fraud, trust, or contract" and therefore a suit *in personam* within the Kentucky court's power. *Id.* That a land title was at issue did not divest the court in Kentucky of jurisdiction. *Id.* This was so even if the question of title

8

"constitut[ed] the essential point on which the case depend[ed]." *Id.* Decrees like that in *Penn* for "specific performance of a contract for lands lying" in foreign areas were within the authority of a court having jurisdiction over a defendant's person, even though "lands not within the jurisdiction of that court may be affected by the decree." *Id.* at 160.[2]

*Massie* is "[p]erhaps the most frequently cited case" on the topic, although the Supreme Court often reiterated *Massie*'s "basic" and "well settled" rule throughout the nineteenth century. Charles Levin, *Extra-Territorial Jurisdiction of Courts of Chancery*, 9 NOTRE DAME L. REV. 399, 399–400 (1934); *see, e.g.*, *Corbett v. Nutt*, 77 U.S. 464, 475 (1870) (stating that a court "could not by the mere force of its decree transfer title to land" beyond its jurisdiction, but "[a] court of equity acting upon the person of a defendant may control the disposition of real property belonging to him situated in another jurisdiction, and even in a foreign country" because the court can "decree a conveyance and enforce its execution by process against the defendant").[3] In each

---

[2] State high court decisions of the era reflect similar reasoning. *See, e.g.*, *Dunn v. McMillen*, 4 Ky. 409, 410 (1809) (explaining "that where the decree is to affect the land directly, . . . then the Court cannot entertain jurisdiction only where the land lies: but where the decree is to affect only the person of the defendant . . . as, for instance, where the bill seeks to have the performance of an [act] or duty which may be done anywhere, then jurisdiction attaches to the Court wherever the defendant may be found"); *Aldridge v. Giles*, 13 Va. 136, 141 (1808); *Davis's Ex'rs v. Fulton*, 1 Tenn. 121, 133 (Super. L. & Eq. 1799); *Kilham v. Ward*, 2 Mass. 236, 259 (1806); *Phelps v. Holker*, 1 Dall. 261, 264 (Pa. 1788).

[3] *See also Hepburn & Dundas' Heirs v. Dunlop & Co.*, 14 U.S. 179, 203 n.d (1816) (stating that when an action cannot proceed *in rem* because the property is outside the reach of the court, "it will compel the specific performance of an agreement by means of its appropriate process acting on the

instance, the decisive question for jurisdictional purposes was whether the relief requested would operate *in personam* or *in rem*, not whether the case required the court to consider questions of title to foreign land.

## B.

As this brief historical sketch indicates, the principles of Texas law governing our decision did not originate in this Court and are not specific to Texas. Their reception into Texas law was a natural consequence of our State's inheritance of English law. So in 1894 when this Court first confronted similar questions in *Texas & Pacific Railway Co. v. Gay*, the consequence of the distinction between *in personam* and *in rem* judgments was already a "well settled" feature of Texas law. Levin, *supra*, at 399.

---

parties"); *Steele's Lessee v. Spencer*, 26 U.S. 552, 556 (1828); *Cherokee Nation v. Georgia*, 30 U.S. 1, 54 (1831) (Thompson, J., joined by Story, J., dissenting) ("If the party is within the jurisdiction of the court, it is all that is necessary to give full effect and operation to the injunction; and it is immaterial where the subject matter of the suit, which is only affected consequentially, is situated."); *Boswell's Lessee v. Otis*, 50 U.S. 336, 348 (1850) ("A bill for the specific execution of a contract to convey real estate is not strictly a proceeding *in rem*, in ordinary cases . . . ."); *Miller v. Sherry*, 69 U.S. 237, 249 (1864) ("When the property is beyond the local jurisdiction of the court, and the defendant is before it, the court can compel him to convey, as it may direct, for any purpose within the sphere of its authority."); *Hart v. Sansom*, 110 U.S. 151, 154 (1884) ("Generally, if not universally, equity jurisdiction is exercised *in personam*, and not *in rem*, and depends upon the control of the court over the parties, by reason of their presence or residence, and not upon the place where the land lies in regard to which relief is sought."); *Johnson v. Powers*, 139 U.S. 156, 159 (1891) ("A judgment *in rem* binds only the property within the control of the court which rendered it, and a judgment *in personam* binds only the parties to that judgment, and those in privity with them.").

Our decision in *Gay* relied heavily on *Massie*. 26 S.W. at 605. We held that a Louisiana court lacked the power to appoint a receiver for property in Texas. *Id.* at 612. We followed *Massie*'s view that courts have jurisdiction over suits about out-of-state lands when the requested relief stems from some underlying obligation between the parties rather than the court's jurisdiction over the territory. *Id.* at 605–06. Appointing a receiver, we held, was a process by which the court exercised dominion over the property in question, meaning the appointment operated *in rem*. *Id.* at 602–03. Because a receiver was an officer of the court having "only such power" as the court had, the receiver's power could not go "where the process of a court cannot go and be entitled to enforcement and respect." *Id.* at 603. *Gay* goes on to discuss the difference between a permissible *in personam* judgment in a suit about foreign property, which is "a power exercised directly on the person over whom the court has jurisdiction," and an impermissible *in rem* judgment about foreign property, which "operates, if at all, as directly on the thing not within [the court's] jurisdiction." *Id.* at 607.

Twenty years later, in *Holt v. Guerguin*, we resolved a family's dispute over the validity of a deed for land in Mexico. 163 S.W. 10. Manuela Guerguin was seventy-five years old, "mentally and physically weak," and bedridden. *Id.* at 11. Her husband, Charles, was ninety years old, blind and deaf. *Id.* at 12. Before they died, Manuela and Charles conveyed all their property to their granddaughter, Adeline Holt—approximately 175,000 acres of land in Mexico. *Id.* Adeline's mother accused her of using fraud and undue influence to steal the land from her grandparents, who could not understand the transaction. *Id.*

11

at 11. A jury agreed, and a district court in Texas annulled the deed conveying the foreign property from Manuela and Charles to Adeline. *Id.* at 12. The case asked whether a Texas court had the power to annul a Mexican deed. *Id.*

We answered no. *Id.* The "district court had not jurisdiction of the subject-matter" because "the court of Texas could not acquire jurisdiction of land beyond its borders." *Id.* Once again citing *Massie*, we recognized that actions *in personam* involving foreign lands were proper, but actions *in rem* were prohibited. *Id.* Crucially for today's purposes, we acknowledged that a Texas court could compel Adeline to cancel the deed herself, because such a judgment could be made effective through the coercion of the defendant. *Id.* But a Texas court could not, by its own power, annul a Mexican deed or establish title to Mexican lands. *Id.* Moreover, we noted that Texas courts consistently denied other states and countries the power to adjudicate title to land in Texas, and we "must observe the same rule that we demand to be observed by others." *Id.*

*McElreath v. McElreath* was another family dispute. 345 S.W.2d 722. Evelyn and James McElreath married and later divorced in Oklahoma. *Id.* at 723–24. During the divorce proceeding, an Oklahoma court ordered James to convey land in Texas to Evelyn. *Id.* at 723. James challenged the order in the Oklahoma Supreme Court, where he lost. *McElreath v. McElreath*, 317 P.2d 225 (Okla. 1957). Before the Oklahoma order could be enforced, James "crossed the Red River" and claimed "sanctuary in Texas." *McElreath*, 345 S.W.2d at 724.

12

"As a matter of justice, good order and common sense," we held that the order must be enforced in Texas. *Id.* The Oklahoma court had jurisdiction over James when it rendered the order, and we saw no jurisdictional problem in the order's obvious consequences for ownership of Texas land. *Id.* at 726–27. We emphasized the "distinction between [a] decree which purports to directly affect title to lands in another state ex proprio vigore [Latin for 'by its own force'] and one which acts upon the parties in personam." *Id.* at 727. While the enforceability of a decree *in rem* depends on the territorial jurisdiction of the court, the "enforceability of an equitable decree in personam" was not so constrained. *Id.* The Oklahoma decree operated *in personam* in that it did "not pass title" of its own force but instead compelled James to effectuate "a transfer of title." *Id.* at 733.

A clear rule that emerges from *Gay* and was reinforced by *Holt* and *McElreath* controls today's case: "If a person be under contractual obligation to convey lands, a court of equity having jurisdiction over his person may compel him to make the necessary conveyance, although the land is in another state." *Gay*, 26 S.W. at 605. That is, when the plaintiff requests a judgment that will bind the defendant to his legal obligation to convey property—rather than a judgment that will vest title in the plaintiff of the judgment's own force—the suit is *in personam*, and the out-of-state location of the property is no bar to jurisdiction. *Id.* In other words, when the "relief sought is such that it may be given by the act of the persons over whom the court exercises jurisdiction," it makes no difference that the act compelled is the conveyance of foreign property. *Id.* In such a case, the court is validly exercising power over a defendant

13

within its jurisdiction, not invalidly exercising power over foreign territory outside its jurisdiction. *Id.* at 605–06.

Our reliance on cases of such vintage should not be taken to indicate that the rule we apply today has fallen into disuse. Contemporary disputes about out-of-state property (often involving contracts for mineral rights) abound. A long line of recent federal district court decisions relies on *Massie* to reject arguments similar to Bauer's and BM2's. *See, e.g., Ganz v. Henderson*, No. 3:25-CV-1587, 2025 WL 3012867, at \*5 (D. Or. Oct. 27, 2025); *Woodbridge Englewood, Inc. v. Angstrom Fiber Englewood, LLC*, No. 3:24-CV-56, 2024 WL 4197906, at \*10 (S.D. Ohio Sep. 16, 2024); *Tap Rock Res., LLC v. Marathon Oil Permian LLC*, 704 F. Supp. 3d 1194, 1201–04 (D.N.M. 2023); *Vondom, LLC v. Suess*, No. 1:20-CV-1157, 2021 WL 5605208, at \*3 (N.D. Ill. Jan. 11, 2021); *Jordan v. Osmun*, No. 1:16-CV-501, 2017 WL 2999689, at \*2 (E.D. Va. Feb. 15, 2017); *United States v. Holland*, No. 2:13-CV-10082, 2015 WL 13866278, at \*6 (E.D. Mich. Sep. 3, 2015); *Greeley v. Walters*, No. 5:10-CV-5003, 2011 WL 941362, at \*4 (D.S.D. Mar. 16, 2011).

The same rule continues to prevail in other state courts as well. Just last year, the Supreme Court of South Carolina noted the "basic principle recognized for centuries" that allows a court to "compel one over whom it has personal jurisdiction to do an act even though that act may affect property outside the court's territorial jurisdiction." *Welch v. Advance Auto Parts, Inc.*, 916 S.E.2d 320, 332 (S.C. 2025) (citing *Massie* and *Penn*). The Supreme Court of Washington also recently discussed the "nearly 200 years" of cases differentiating between a court's "powers

over title to property versus personal interests in property." *OneWest Bank, FSB v. Erickson*, 367 P.3d 1063, 1072 (Wash. 2016). These decisions reinforce the longstanding rule that a court's power to adjudicate a dispute involving foreign property depends on whether the property or the person is the object of the judgment—not on whether the gist of the claim is a question of title to foreign property.

## C.

The court of appeals applied a different rule, developed in several Texas appellate decisions, under which Texas courts lack jurisdiction if the gist or gravamen of a claim involves adjudication of title to foreign real estate. 689 S.W.3d at 637. We disapprove of this rule and the decisions applying it.

Although the rule's exact origin is difficult to pinpoint, an influential example is *Kelly Oil Co. v. Svetlik*, 975 S.W.2d 762 (Tex. App.—Corpus Christi–Edinburg 1998, pet. denied), a dispute over royalty payments on oil and gas in Mississippi. The court cited *Massie* for the proposition that the key jurisdictional question is "whether the cause before the Court involves a naked question of title." *Id.* at 764. It then acknowledged that "[t]he primary purpose of Svetlik's lawsuit was to enforce his overriding royalty interests in a number of oil and gas leases," i.e., to require the defendants to honor their personal obligation to pay him. *Id.* Nevertheless, the court reasoned, Svetlik's entitlement to payment "depend[ed] upon a finding that he is the owner of an overriding royalty under the original oil and gas leases." *Id.* Thus, "the outcome of Svetlik's lawsuit depend[ed] upon a determination as to who owns the title to a real property interest." *Id.* The court dismissed for

15

lack of jurisdiction on the basis that it had "no power or jurisdiction to adjudicate title to interests in real property located in another state." *Id.*

Later decisions embrace similar reasoning. They acknowledge the correct background rules from cases like *Massie*, *Gay*, *Holt*, and *McElreath*, but they ultimately conclude that the "gist" or "gravamen" of a suit that seeks to hold the defendant to his obligations with respect to foreign real property is an impermissible effort to have a Texas court "adjudicate title" to land outside Texas. *See, e.g.*, *Trutec Oil & Gas, Inc. v. W. Atlas Int'l*, 194 S.W.3d 580 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *Devon Energy Prod. v. KCS Res., LLC*, 450 S.W.3d 203 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).[4]

These cases misperceive the distinction of jurisdictional significance, which is the "distinction between [a] decree which purports to directly affect title to lands in another state ex proprio vigore [Latin

---

[4] The gist rule, as applied below, incorporates reasoning derived from *Merit Management Partners I, L.P. v. Noelke*, 266 S.W.3d 637 (Tex. App.—Austin 2008, no pet.), a case about a county court's statutory jurisdiction. In that case, the court analyzed whether a claim was a "suit for the recovery of land" under section 26.043(8) of the Government Code such that it belonged in a district court, not a county court. *Id.* at 643. The court concluded that "[r]egardless of the plaintiff's characterization of his claims, if the 'gist' of a cause of action for damages is, in fact, an adjudication of title, a county court does not have jurisdiction over the cause of action." *Id.* at 647. Reasoning that title was an issue in the suit, the court looked at "whether the title issue is merely incidental or collateral to the suit." *Id.* at 648. These considerations— perhaps valid with respect to the limits on a county court's statutory jurisdiction—later improperly found their way into cases dealing with the limits on a district court's subject-matter jurisdiction over disputes involving out-of-state property. *See, e.g.*, *Fox v. Fox*, No. 14-18-00672-CV, 2020 WL 1265366, at *3 (Tex. App.—Houston [14th Dist.] Mar. 17, 2020, no pet.).

16

for 'by its own force'] and one which acts upon the parties in personam." *McElreath*, 345 S.W.2d at 727. Indeed, *Massie*'s approach to the latter category is essentially the opposite of the "gist" rule: "[T]he principles of equity give a court jurisdiction wherever the person may be found, and the circumstance, that a question of title may be involved in the inquiry, and may even constitute the essential point on which the case depends, does not seem sufficient to arrest that jurisdiction." 10 U.S. at 158.

Under *Massie* and this Court's cases following it, a "naked question of title" arises when a court is asked to exercise *in rem* jurisdiction to establish or alter title "by the mere force of its decree." *Corbett*, 77 U.S. at 475. By contrast, when the "relief sought is such that it may be given by the act of the persons over whom the court exercises jurisdiction," a court may afford the relief by an *in personam* judgment. *Gay*, 26 S.W. at 605–06. In other words, a permissible *in personam* breach-of-contract action or claim for royalty payments is not converted into an impermissible *in rem* suit to try title merely because resolution of the claim requires the court to decide whether one party or the other holds title to foreign lands.

The proper focus is on the nature of the court's *judgment*, not on the legal questions the court confronts on the way to its judgment. The "judicial power" vested in Texas courts by article V, section 1 of our Constitution is "the power of a court to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for a decision." *Morrow v. Corbin*, 62 S.W.2d 641, 644 (Tex. 1933); *see Tex. Dep't of Fam. & Protective Servs. v. Grassroots Leadership, Inc.*, 717 S.W.3d 854, 868 (Tex. 2025) (describing the judicial

17

power as the power to make authoritative and final judgments in individual cases).  In other words, a court's job is to render judgments that resolve cases.  Answering the attendant legal questions is a necessary but ultimately subsidiary function.  When a judgment operates *in personam*, as do most civil judgments, "[n]one but parties or privies are bound by [the] judgments" resolving their cases. *Blankenship v. Wartelsky*, 6 S.W. 140, 142 (Tex. 1887).  "The only apparent exception to this rule in general, is the effect of a proceeding *in rem*, which from the necessity of the case is binding on all persons." *Dupasseur v. Rochereau*, 88 U.S. 130, 135–36 (1874).

Thus, when a Texas court answers a legal question about title to foreign property in the course of issuing an *in personam* judgment, the answer binds only the parties and does not establish who owns the property in any definitive or absolute sense.  Nor could it do so, since a Texas court lacks the power to exercise *in rem* jurisdiction over out-of-state lands. *Gay*, 26 S.W. at 605–06; *Holt*, 163 S.W. at 12; *McElreath*, 345 S.W.2d at 727–29.  In contrast, a Texas court does not lack the power to issue a judgment requiring a party within its jurisdiction to abide by the party's legal obligations with respect to out-of-state lands. *Gay*, 26 S.W. at 605–06; *Holt*, 163 S.W. at 12; *McElreath*, 345 S.W.2d at 727–29.

This ancient jurisdictional rule does not arise from a conviction that Texas courts must avoid opining on legal questions about land in other states.  Courts apply out-of-state law all the time.  The rule is instead dictated, ultimately, by the physical scope of the State of Texas's power (i.e., jurisdiction) to coerce compliance with the judgments of its courts.  As we said in *Gay*: "[T]he highest test of the jurisdiction of a

18

court in a given case is found in the answer to an inquiry whether it has lawful power thus to enforce its judgment or decree." 26 S.W. at 604. A Texas court can coerce a Texas party to convey land, make a royalty payment, or reform a deed—no matter where the land lies—because the "relief sought is such that it may be given by the act of the persons over whom the court exercises jurisdiction." *Id.* at 605. In contrast, a Texas court cannot enforce compliance with an *in rem* judgment purporting to definitively establish ownership of land over which the State of Texas has no power. The rule described in *Massie*, *Gay*, *Holt*, and *McElreath* is grounded in this basic physical reality. Expanding the rule to prohibit *in personam* judgments that happen to be predicated on questions of title to foreign real property was the very error those cases warned against. We disapprove of the court of appeals decisions employing that approach.[5]

## III.

Turning to the claims in this case, we conclude that the location of the disputed mineral rights, in West Virginia, does not deprive Texas courts of jurisdiction over BM3's suit.

The district court's judgment awards BM3 four categories of relief: (1) specific performance of the agreements between the parties; (2) reformation of nineteen mineral deeds to reflect BM3's name; (3) a

---

[5] *See, e.g.*, *Svetlik*, 975 S.W.2d at 764; *Trutec Oil*, 194 S.W.3d at 587–88; *Devon Energy*, 450 S.W.3d at 216; *Fox*, 2020 WL 1265366, at *3; *Danish Leasegroup, Inc. v. York Oil & Gas Mgmt.*, 362 S.W.3d 220, 226 (Tex. App.—Dallas 2012, no pet.); *York v. Oleum Operating Co.*, No. 06-16-00056-CV, 2017 WL 2622797, at *5 (Tex. App.—Texarkana June 16, 2017, no pet.).

declaration affirming BM3's ownership of the disputed royalties; and (4) an injunction prohibiting the defendants from transferring the deeds or the royalty payments. Each of these enforces obligations the defendants allegedly agreed to undertake with respect to the property in question. Each would operate *in personam*, and each is within the jurisdiction of Texas courts.

The gist of BM3's suit is that the parties agreed BM3 would own the disputed mineral rights but now the paperwork says BM2 owns them, in violation of the deal. BM3 wants the courts to make Bauer and BM2 fix this problem, one way or another, in conformance with obligations to which Bauer and BM2 allegedly agreed. All BM3's claims for relief fit this description. As explained above, when a party is "under [a] contractual obligation to convey lands," as BM3 claims these defendants were, a Texas court with jurisdiction over the defendants "may compel [them] to make the necessary conveyance, although the land is in another state." *Gay*, 26 S.W. at 605. That rule governs this case, and under that rule, Texas courts have jurisdiction over BM3's suit.

We turn briefly to the particular relief the district court awarded. Going all the way back to *Penn*, "specific performance of a contract for lands lying" elsewhere is the quintessential example of *in personam* relief available in a court of equity even though "lands not within the jurisdiction of that court may be affected by the decree." *Massie*, 10 U.S. at 160 (discussing *Penn*). The same is true of deed reformation, which is equitable relief "made effectual through the coercion of the defendant, as, for instance, by directing a deed to be executed or cancelled by or on

20

behalf of the party," and is likewise within the court's jurisdiction. *Holt*, 163 S.W. at 12 (quoting *Carpenter v. Strange*, 141 U.S. 87, 106 (1891)). BM3's request for reformation of the nineteen deeds thus seeks the very remedy we approved in *Holt*. *Id.* The district court understood BM3's request that way; it ordered BM2 to reform the deeds rather than purporting to do so itself by the power of its judgment.

As for the injunction, "it is axiomatic that injunctive relief is an equitable remedy, subject to equitable principles." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 656 n.8 (Tex. 2006). "Equitable remedies operate in personam," meaning they bind only the parties to a suit, not the world. *City of Dallas v. Wright*, 36 S.W.2d 973, 976 (Tex. 1931); *see also* 44 TEX. JUR. 3D *Injunctions* § 5 (updated Mar. 2026) ("An injunction acts *in personam* and not *in rem*."). The injunction binds only Bauer and BM2 and would not run with the property in West Virginia or apply to others not in privity with the defendants. *See Ex parte Davis*, 470 S.W.2d 647, 649 (Tex. 1971). The injunction holds the defendants to their "contractual obligation to convey lands," *Gay*, 26 S.W. at 605, and thus operates well within the court's *in personam* authority over the defendants.

The declaratory judgment concerning BM3's ownership of the disputed royalties was also within the district court's power. A declaratory judgment under Chapter 37 of the Civil Practice and Remedies Code "does not prejudice the rights of a person not a party to the proceeding." TEX. CIV. PRAC. & REM. CODE § 37.006(a). Such a declaration is thus, by definition, an *in personam* judgment binding only on the parties. This limitation is reinforced by the requirement that

21

"[w]hen declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties." *Id*. § 37.004(c). A declaration can only establish, as between the parties, whose claim prevails under an existing instrument or agreement. It cannot adjudicate title in an absolute or definitive sense, as against the world, and any declaration purporting to do so would not actually accomplish that result. *See State v. Morales*, 869 S.W.2d 941, 947 (Tex. 1994) ("A litigant's request for declaratory relief cannot confer jurisdiction on the court, nor can it change the basic character of a suit.").

A glance at federal law, with which Chapter 37 should be "harmonized, as far as possible," TEX. CIV. PRAC. & REM. CODE § 37.002(c), confirms this conclusion. Declaratory judgments resolve "the legal rights *of the parties*." *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (emphasis added). They are thus "powerless" against parties outside of the suit. *Id.* "After all, the point of a declaratory judgment 'is to establish a binding adjudication that enables the parties to enjoy the benefits of reliance and repose secured by res judicata.'" *Id.* (quoting 18A WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 4446 (3d ed. Supp. 2022)).

The district court's declaration that BM3 is the rightful owner of the disputed royalty interests pursuant to the parties' agreements seeks to require the defendants to convey property as they allegedly promised to do, which is a form of *in personam* relief we have long approved, even when the subject is foreign lands. *See generally Gay*, 26 S.W. 599. The

22

declaration does not apply to anyone outside this lawsuit, much less to the world. It did not exceed the court's jurisdiction.

In sum, all the relief awarded to BM3 by the district court "is made effectual through the coercion of the defendant[s]." *Holt*, 163 S.W. at 12 (quoting *Carpenter*, 141 U.S. at 106). Nothing about the district court's judgment purports, "by the mere force of its decree, to annul a deed, or to establish a title." *Id.* (quoting *Carpenter*, 141 U.S. at 106). The judgment validly enforces a "contractual obligation to convey lands," which is consistent with our precedent "although the land is in another state." *Gay*, 26 S.W. at 605.[6]

---

[6] Bauer and BM2 also argue that the "local action doctrine" bars this suit, which they characterize as a local action that can only be pursued in West Virginia. We are not convinced. Historically, the local action doctrine holds that "[i]f the cause of action is one that might have arisen anywhere, it is transitory; if it could have arisen only in one place, it is local" and must be brought locally. 1A TEX. JUR. 3D *Actions* § 51 (updated Mar. 2026). The doctrine is rarely invoked in modern cases, and its continuing vitality is a matter of some debate. *See Mallory v. Norfolk S. Ry.*, 600 U.S. 122, 129 (2023) ("This rule governing transitory actions still applies to natural persons today. Some call it 'tag' jurisdiction."); Jeffrey L. Rensberger, *Jefferson's Ghost: The Local Action Rule in Federal Courts*, 44 CARDOZO L. REV. 2423 (2023) (arguing that the local action rule was a rule of venue and has since been eliminated). We need not wade into that debate because even if the doctrine retains its force and has consequences for jurisdiction (rather than merely venue), it would not change the outcome here. As we observed in *Gay*, actions for enforcement of contractual rights are transitory, while suits to quiet title are local. *See* 26 S.W. at 607–08; *see also Massie*, 10 U.S. at 162–63 ("If we reason by analogy from the distinction between actions local and transitory at common law, this action would follow the person, because it would be founded on an implied contract, or on neglect of duty."). Thus, distinguishing between suits about foreign property based on the rule we employ today leads to the correct result under the local action doctrine as well.

## IV.

The judgment of the court of appeals is reversed, and the case is remanded to that court for consideration of the remaining arguments.

James D. Blacklock
Chief Justice

**OPINION DELIVERED:** May 15, 2026